THE LOCKWOOD COMPANY, in equity,

*vs.*

EDWARD J. LAWRENCE and others.

Kennebec.    Opinion April 22, 1885.

*Waters.    Waste from saw mills thrown into the river.    Multifariousness.    Equity.
Riparian owners.    Reasonable use.    Prescription.*

Where several respondents, though acting independently of each other, deposit the refuse material and debris arising from the operation of their mills into the same stream, whence, by the natural current of the water, it is carried down the river and commingles into one indistinguishable mass before reaching the complainant's premises. *,Held,* upon a bill in equity for perpetual injunction :

1. That this commingling of the waste, thus thrown into the stream, and which, after thus uniting and commingling, is precipitated by the current upon the premises of the complainant, creating the nuisance and inflicting the injuries of which he complains, is the natural and necessary consequence of the several and independent action of the respondents.

2. Whatever may have been the act of these different respondents, either in the operation of their several mills or in the depositing of the waste and debris, arising from such operations, into the stream, there is a co-operation in fact, in the production of the nuisance.

3. The claim thus to discharge the waste and debris from their mills into the stream constitutes one common interest, though not a joint right.

4. The acts of the respondents may be independent and several, but the result of these several acts combines to produce whatever damage or injury the complainant suffers, and in equity constitutes but one cause of action, and all the respondents may be joined in the same bill to restrain the nuisance.

5. It is otherwise in an action at law where damages are sought to be recovered.

Where the same relief is asked against all claiming a common right, and the same general acts are alleged and proved against all as contributing to the same nuisance; and where the object of the bill is single, to establish and obtain relief for one claim, in which all the respondents may be interested, it is not multifarious, although the respondents may have different and separate interests.

Nuisances and injuries affecting waters, including the obstruction, diversion, or pollution of streams, afford sufficient ground for equitable interference, on the ground of restraining irreparable mischief.

This is true when the acts complained of are of such a character that irreparable injury will result without such interference, or the necessity is imperious, or where adequate compensation for the injury arising therefrom may not be obtained at law, or, if continued, would lead to a multiplicity of suits.

Such a case forms an exception to the general rule, requiring that where a nuisance is claimed to exist, the fact of its existence should, ordinarily, be established by a suit at law before a court of equity will interfere.

The rights of riparian proprietors upon a natural stream are not absolute but qualified, and each party must exercise his own reasonable use of the water, as it flows past or through his land, with a just regard to the like reasonable use by all others who may be affected by his acts.

The law does not lay down any fixed rule for determining what is a reasonable use of the water of a stream by a riparian proprietor.

The reasonable use depends upon the circumstances of each particular case.

In order to establish a prescriptive right or easement in the land or water of another person, the enjoyment of such right must have been uninterrupted, adverse, under claim of right, and with the knowledge of the owner, or with such acts that knowledge will be presumed.

The prescriptive right to the use of a stream beyond the general right of reasonable use, as against other riparian owners, is governed by the same principles as those in relation to easements in land, and in order to establish such right there must be a perceptible amount of injury throughout the period necessary to gain such right.

BILL IN EQUITY.

Heard on bill, answers and proof.

Washington B. Bragg, one of the respondents filed no answer and entered no appearance, but there was no motion to take the bill *pro confesso* as to him.

The defendants, Lawrence, Phillips and Company, Fairfield Furniture Company, J. A. Cilley and Company, The Maine Manufacturing Company, E. Totman and Company, N. Totman and Sons, Stephen A. Nye, and A. H. and C. E. Duren, joined in one answer.

Weston and Brainard filed a separate answer.

The material facts are stated in the opinion.

*Edmund F. Webb* and *Appleton Webb*, for the plaintiff, cited: *Woodruff* v. *No. Bloomfield, &c. Co.* 8 Sawyer C. C. 628; *Blaisdell* v. *Stephens*, 14 Nev. 17; 3 Pom. Eq. Jur. § 1351; *Coe* v. *Company*, 37 N. H. 265; *Mayor of York* v. *Pilkington*, 1 Atkyns, 282; *Chipman* v. *Palmer*, 77 N. Y. 51; *Wood* v. *Sutcliffe*, 8 Eng. L. & E. 217; *Railroad & Coal Co.* v. *Richards*, 57 Penn. 142; *Seely* v. *Alden*, 61 Penn. 302; *Bard* v. *Yohn*, 26 Penn. 482; 1 Pom. Eq. Jur. 251; *Parker* v. *Cotton Co.* 2 Black, 545; 16 Ves. 342; *Eastman* v. *Company*, 47 N. H. 71; *People* v. *Chicago*, 53 Ill. 424; *Armstrong* v. *Gilchrist*, 2 John Cas. 424; *Jesus College* v. *Bloom*, 3 Atkyns, 262; *Lawson* v. *Menasha*, (Wis. January, 1884); *Clark* v. *Stewart*, 56 Wis. 154; *Garwood* v. *N. Y. C. R. R. Co.* 84 N. Y. 404; Gould, Waters, § § 562, 564, 508, 214, 511, 512; *Ingraham* v. *Dunnell*, 4 Met. 118; *Sprague* v. *Rhodes*, 4 R. I. 301; *Parker* v. *Company*, 2 How. 551; *Varney* v. *Pope*, 60 Maine, 195; *Porter* v. *Witham*, 17 Maine, 292; *Burnham* v. *Kempton*, 44 N. H. 94; 2 Story, Eq. 925; Eden, Injunctions, 286; *Lyon* v. *McLaughlin*, 32 Vermont, 423; *Wilson* v. *Mineral Point*, 39 Wisconsin, 160; *Webber* v. *Gage*, 39 New Hampshire, 186; *Campbell* v. *Seaman*, 63 New York, 568; *Atchinson* v. *Peterson*, 20 Wol. 511; *Tyler* v. *Wilkinson*, 4 Nason, 379; 3 Kent's Commentaries, 439, 215, 442; *Gerrish* v. *Brown*, 51 Maine, 262; *Dwinell* v. *Veazie*, 50 Maine, 479; *Wadsworth* v. *Tillotson*, 15 Conn. 366; *Twiss* v. *Baldwin*, 9 Conn. 305; *Platt* v. *Johnson*, 15 Johns. Rep. 213; *Red River Roller Mills* v. *Wright*, 30 Minn. 249; *Prentice* v. *Geiger*, 74 N. Y. 343; *Gould* v. *Boston Duck Co.* 13 Gray, 442; *Hayes* v. *Waldron*, 44 N. H. 580; *Snow* v. *Parsons*, 28 Vt. 459; *Parker* v. *Hotchkiss*, 25 Conn. 321; 4

Black. Com. 166, 167 ; 3 Black. Com. 215 ; *Crosby* v. *Bessey*, 49 Maine, 539 ; *Cooper* v. *Barber*, 3 Taunt. 99 ; *Thurber* v. *Martin*, 2 Gray, 394 ; *Gilmore* v. *Driscoll*, 122 Mass. 207 ; *Heath* v. *Williams*, 25 Maine, 211 ; *Taylor* v. *People*, 6 Park, Cr. 353 ; *Com.* v. *Upton*, 6 Gray, 473 ; *People* v. *Cunningham*, 1 Denio, 536 ; Wash. Easements, 346 ; *Underwood* v. *Scythe Co.* 41 Maine, 292 ; Wood, Nuisances, § 435–802 ; *Richmond M'f'g Co.* v. *Atlantic De L. Co.* 10 R. I. 110 ; *Fletcher* v. *Ryland*, L. R. 1 Ex. 265 ; *Beardmore* v. *Tredwell*, 7 L. T. 207 ; *Boynton* v. *Gill*, 1 Rolle's Abr. 140 ; *Res Publica* v. *Caldwell*, 1 Dallas, 150 ; *Gile* v. *Stevens*, 13 Gray, 146 ; *Francis* v. *Schoellkopf*, 53 N. Y. 152 ; *Merrifield* v. *Lombard*, 13 Allen, 16 ; *Belknap* v. *Trimble*, 3 Paige, 601 ; *Rowell* v. *Jewett*, 69 Maine, 303 ; *Lewis* v. *Small*, 71 Maine, 554 ; *Stinchfield* v. *Milliken*, 71 Maine, 570 ; *Pulsifer* v. *Waterman*, 73 Maine, 244 ; *Hayden* v. *Whitmore*, 74 Maine, 234 ; *Taylor* v. *Taylor*, 74 Maine, 588 ; *Washburn* v. *Gilman*, 64 Maine, 164 ; *Bemis* v. *Upham*, 13 Pick. 169 ; *Boston W. P. Co.* v. *B. & W. R. R. Co.* 16 Pick. 512 ; *Ballou* v. *Hopkinton*, 4 Gray, 324 ; Hilliard, Injunctions, 16 ; *Canfield* v. *Andrews*, 54 Vt. 1.

*Brown and Carver*, for the Fairfield mill-owners, respondents.

A bill in equity should contain a clear and explicit statement of the plaintiff's case. Rules of Court, VI ; 102 U. S. 418 ; 3 Wheat. 258 ; Heard's Eq. Pl. 30 ; 129 Mass. 382 ; 21 Pick. 526 ; 22 Pick. 55.

The bill alleges : "Plaintiffs are informed and believe and therefore aver that at the time of the erections of said manufactories they were and still are entitled to the natural flow of the water in said river to and through said land, and to have said water come to their said manufactories, flumes, ponds, raceways, and wheels in their natural purity." This is the statement of the plaintiff's right. It is made on information and belief, and leaves the court to determine it. But it is not the province of the court to determine the plaintiff's right. It is to protect a right after it has been determined. 1 Pom. Eq. §§ 95–112. Then the only complaint against the defendants, alleged in the bill,

is that they severally owned and operated certain mills " by means of which the refuse material . . . arising therefrom are discharged, cast, carried and deposited into said river." It is only by implication and inference that any defendant is charged with doing anything except to operate his mill.  121 Mass. 148 ; Heard, Eq. Pl. 31, 36, 44 ; 3 Drew, 735 ; Dewey, Eq. Pl. 17.

This bill is bad for multifariousness.  Each defendant's interest and ownership in mills is separate, independent and distinct. Each defendant should have the privilege of defending himself by showing in his answer the particular circumstances pertaining to his case.  Story, Eq. Pl. § § 272, 530, 531, 538, 541 ; Cooper, Eq. Pl. 182 ; 2 Dick. R. 677 ; 1 Madd. R. 88.  Where there is no privity between defendants and each injures a single right of the plaintiff, but by different means, the plaintiff should bring separate bills against each defendant.  2 Ves. Jr. 486, 328 ; 6 Johns. Ch. 155 ; 5 Paige, 160 ; 18 Ves. 72 ; 2 Mason, 201 ; 2 Sanford, 344 ; Mitf'd, Pl. 181 ; 2 Aust. 469 ; 5 Gill, 381 ; 2 Sch. and Lefr. 371 ; 5 Paige, 65.  Where the plaintiff seeks to establish a claim growing out of one general right and the defendants may justify their several acts on dissimilar grounds, separate bills must be filed against each.  2 Ves. 487, 323 ; Hardv. 337 ; 2 Austr. 476 ; 8 Peters, 128 ; 1 Younge, 373 ; 1 Mylne & Cr. 618 ; 6 Johns. Ch. 139 ; 4 Cowan, 682 ; 8 Georgia, 238 ; 8 Clark and Fin. 435 ; 4 Younge, 444.  See also *Pointon* v. *Pointon*, L. R. 12 Eq. 552 ; Heard, Pl. 36, 39 ; 5 Madd. 138 ; 6 Dana, 186 ; 7 J. J. Marsh, 37 ; 20 Pick. 368 ; 1 Pom. Eq. § 418 ; 1 Allen, 166 ; 10 Cush. 252.

Large interests are involved on both sides in this case.  The plaintiff is located at one point, employing its labor and capital at Waterville.  The defendants employ their labor and capital through the whole valley of the upper Kennebec and its tributaries.  A blow aimed at the lumbering interests affects more people than would be affected by interfering with almost any other interest in this section of the state.  These mills have been in operation many years.  The plaintiff corporation only about eight years.

Counsel further discussed in an able argument, the questions arising in the case, citing: High. Injunctions, § § 8, 505; *Varney* v. *Pope*, 60 Maine, 192; *Porter* v. *Witham*, 17, Maine, 292: 42 Maine, 119; 47 N. H. 71; *Fuller* v. *Melrose*, 1 Allen, 166; *Tash* v. *Adams*, 10 Cush. 252; Pom. Eq. Jur. § 418; *Birmingham Can. Co.* v. *Lloyd*, 18 Ves. 515; *Weller* v. *Smarton*, 1 Cox, 102; *Reid* v. *Gifford*, 6 Johns. Ch. 19; *Irwin* v. *Dixion*, 9 How. 10; *Eastman* v. *Amoskeag Co.* 47 N. H. 71; *Mohawk, &c.* v. *Utica, &c.* 6 Paige, 554.

*J. W. Spaulding* and *F. J. Buker*, for the respondents, *Weston and Brainard.*

FOSTER, J. The bill alleges in substance that the complainants are the owners and in possession of a large amount of real and personal estate, consisting of lands, dams and water power, including mills and machinery employed in manufacturing cotton into fabrics, situated at Waterville, on both banks of the Kennebec river, not navigable for vessels or boats at that place, their dams extending across said river; that in 1874, they built a manufactory of thirty-four thousand spindles, and in 1882, another of fifty-five thousand spindles, both of which have been in use since their erection, and that in said business they have a capital of two million two hundred thousand dollars, employing more than one thousand persons, with a pay roll of about two thousand five hundred dollars each day, and an annual production of one million three hundred thousand dollars; that they are entitled to the natural flow of the water in said river, and to have it come to their manufactories in its natural purity. And they allege that the respondents, during the past six years, have severally owned and operated large saw mills, containing shingle, clapboard and other manufacturing machines, and planing mills, and shovel handle mills, situated above the complainants on said river, between and including Skowhegan and Fairfield, which they are respectively and separately operating, by means of which the refuse material, sawdust, edgings, shavings, refuse wood and other debris arising therefrom, are discharged therefrom into said river, and vast quantities are carried by the current down

the river, and before reaching the complainants' premises, it commingles into one indistinguishable mass, and thus uniting, flows along said river into their ponds, raceways, racks and wheels, filling the same and thereby stopping the wheels and retarding and preventing the running and operating of their manufactories, whereby they lose the benefit, advantage and profits of the same, rendering it necessary to expend large sums of money in removing this waste and debris, causing great damage, constituting a great nuisance, which is rapidly increasing and becoming more intolerable, which operations are still continued and will be continued, and that a destruction of complainants' profits and irreparable injury will result, unless the respondents are restrained by injunction; that each respondent is independently working his own mill, without any conspiracy or preconcert of understanding or action with the others, and it is impossible to distinguish what particular share of damage each has inflicted or will inflict, but that each has contributed, and is now contributing to constitute the nuisance, making an unreasonable use of the water of said river, destroying its value, illegally interrupting the complainants in its use, and rendering it unfit for manufacturing purposes; and that they have no remedy, except in equity.

The prayer is for a perpetual injunction, restraining the respondents from depositing waste, enumerated in the bill, in said river.

The answer substantially sets forth admission of title and possession of the premises of the parties as alleged, and claiming that the respondents were severally operating such mills, manufactories and machinery as alleged, which are used to manufacture lumber owned by most of the respondents, and cut near the head waters of the Kennebec; that most of the respondents own large tracts of timber land situate in the northern part of the state, and have invested in said lumbering business large amounts of money, and employ annually a large number of men in cutting, hauling, driving, booming, and sawing said lumber, their business having continued for more than thirty years, and having become of very large proportions, furnishing

employment for a large proportion of the laboring men living on the Kennebec river; that said mills and manufactories were all located where they now are more than thirty years ago, having been operated during all that period in the same places and manner as now, and that there have always, during said time, been thrown into said river whatever refuse materials the occupiers of said mills saw fit, consisting of slabs, edgings, shavings, and all other refuse materials of various kinds evolved from said operations, but with much less quantity during the past six years, and only so much as, with proper care and caution on the part of complainants to protect their manufactories, would do no injury to them, and that the respondents have acquired a prescriptive right to use said river as they have heretofore done; they deny that, during the past six years, any refuse or waste from their mills have been unlawfully deposited in the said river, or unlawfully interfered with the complainants' rights, and that whatever damage or annoyance they have suffered is attributable to the improper construction of their dams, flumes, racks, wheels and other apparatus used in carrying on their manufactories; that the granting of the prayer of complainants as set forth, will prevent the respondents from operating their mills, and destroy their lumbering business. They also deny that the allegations of the bill entitle the complainants to equitable relief, and, claiming all benefit of demurrer in their answer to this part of the bill, say that it can not be maintained against these respondents jointly, they being, as therein alleged, engaged independently of each other in operating their several mills, manufactories and machinery, and with no conspiracy or preconcert of understanding or action with each other.

I. The case is one of importance, as it embraces the rights of parties in property of great value on each side, and in the lawful management and enjoyment of which each party is entitled to protection by law. It is one, also, that in its proper consideration is not entirely free from difficulties. The parties have interests which, in the management and enjoyment of their property, are conflicting; and while it becomes the duty of the court to settle their respective rights, we must be governed by the established

rules and principles of equity, and which in their general operation are just and salutary.

1. The question to be first considered is the objection raised in the answer, with the force of a demurrer, to the joinder of these several respondents in this bill. It is insisted that the cause of action is distinct and several as against each of the respondents, and that neither they, nor the several causes of action, can be joined in the same bill, and that the objection by demurrer is fatal on account of misjoinder and multifariousness.

While it is true that the allegations in the bill set forth that each respondent is independently working his own mill, and machinery, without any conspiracy or preconcert of understanding or action with the others, it also appears that the refuse material, sawdust, edgings, shavings, refuse wood and other debris arising from operating said mills, cast and deposited into the river, are carried down by the current, and before reaching the complainants, commingles into one indistinguishable mass, and thence are carried down into the ponds, raceways, racks and wheels of the complainants' manufactories, inflicting the injury of which they complain; and that it is impossible to distinguish what particular share of damage each respondent has inflicted, or will inflict, but that each has contributed and now is contributing to constitute the said nuisance. In considering the questions thus raised by the pleadings upon this branch of the case, and assuming the facts set forth by the allegations in the bill to be true, no other conclusion can be reached than that the respondents, though acting independently of each other as alleged, all deposit the refuse material and debris arising from the operation of their mills into the same stream, whence, by the natural current of the water, it is carried down the river and commingles before reaching the complainants' ponds, raceways, racks and wheels, where the nuisance complained of is committed. This commingling of the waste thus thrown into the stream, and which, after thus uniting and commingling, is precipitated by the current upon the premises of these complainants, creating the nuisance and inflicting the injuries of which they complain, is the

natural and necessary consequence of the several and independent action of these respondents. It is the combined action of this waste from the different mills, uniting and mingling, and thence drifting down upon the complainants, which creates the nuisance, and produces the injuries complained of.

Whatever, then, may have been the act of these different respondents, either in the operation of their several mills, or in the depositing of the waste and debris arising from such operations, into the stream, there is a co-operation in fact in the production of the nuisance. They all claim a right to discharge the waste and debris from their mills into this river, and in this, their claim constitutes one common interest, though not a joint right. The acts of the respondents may be independent and several, but the result of these several acts combines to produce whatever damage or injury these complainants suffer, and in equity constitutes but one cause of action. It is otherwise in law where damages are sought to be recovered. There, only those parties can be joined who have acted jointly in the commission of the act. There must be concert of action and co-operation to make several persons jointly liable in an action at law. " There is a very great difference, " says the court in *Woodruff* v. *North Bloomfield Gravel Mining Co.*, 8 Sawyer, (U. S. C. C.) 628, " between seeking to recover damages at law, for an injury already inflicted by several parties acting independently of each other, and restraining parties from committing a nuisance in the future. In equity, the court is not tied down to one particular form of judgment. It can adapt its decrees to the circumstances in each case, and give the proper relief as against each party, without reference to the action of others, and without injury to either. Each is dealt with, with respect to his own acts, either as affected or unaffected by the acts of the others. It is not necessary for the prevention of future injury, to ascertain what particular share of the damages each defendant has inflicted in the past, or is about to inflict in the future. It is enough to know that he has contributed, and is continuing to contribute to a nuisance, without ascertaining to what extent, and to restrain him from contributing at all. "

This question has recently been before the court in California in the case of *Keyes* v. *Little York Gold Washing Co.*, 53 Cal. 724, where a different doctrine was laid down, and in support of that claimed by the counsel for the respondents. But that case may be considered as substantially overruled by the more recent decision of *Hillman* v. *Newington*, 57 Cal. 56, a case in the same court, sustaining the views which we entertain in the case before us.

Again the same question arose in that state and was decided as late as 1883, in the circuit court of the United States, in the case of *Woodruff* v. *North Bloomfield Gravel Mining Co.*, 8 Sawyer, (U. S. C. C.) 628. In that case, the complainant was the owner of lands situated on the Yuba and Feather rivers; the respondents were miners severally and independently engaged in hydraulic mining at points above on the Yuba river and its affluents, and by means of which large quantities of gravel, waste, earth and other debris arising therefrom, were discharged into the several streams on which the mines were situated, and by the rapid currents of the water, were carried down the various streams into the Yuba river, where they commingled before reaching the valley, and after thus uniting, flowed along the main Yuba river, and were deposited upon the complainant's lands. An injunction was sought to restrain the several respondents from depositing the debris of their mines where it would be swept into the river. The respondents demurred to the bill. In that case, as in this, no damages were sought, but equitable relief to restrain future action — future contribution by each to the alleged nuisance. Judge SAWYER held that the bill could be filed against all the respondents who contributed to produce the injury by depositing debris in the stream above, and denied the doctrine of *Keyes* v. *Little York Gold Washing Co.*, as not being " in accordance with the principles of equity jurisprudence in England, or generally, in the United States, as established by the authorities."

Another recent case is that of *Blaisdell* v. *Stephens*, 14 Nev. 17, which was a combined suit at law, to recover damages which had already resulted from a nuisance, and, in equity, for an

injunction to restrain its continuance. There were two respond-
ents, who each, separately and independently of the other,
allowed water to run from his land upon the land of the
complainant, and from the combined action of which the com-
plainant's ditch was injured, which constituted the nuisance
complained of. There was a joint judgment for the damages,
and an injunction, from which an appeal was taken to the
Supreme Court, where it was held that the acts of each party
being independent of the other, there was no joint liability for
the damages, reversed the judgment and ordered a new trial.
Upon a rehearing it was claimed that, even if the judgment at
law for damages could not be maintained, it was a proper case
for equitable relief, and the court held, in accordance with the
authorities, that there could be no joint recovery at law for
damages, but that it was a proper case for an injunction; the
case was remanded, with directions that if the damages which
had been recovered at law should be remitted within fifteen days,
the decree for injunction should stand. In that case, the principle
is clearly recognized and adopted that parties, who, by their
several and independent acts, contribute to the production of a
nuisance, although they can not properly be joined in an action
at law for damages, may be rightfully joined in a suit in equity
for injunction to restrain a future contribution by each to the
nuisance.

"There is a common interest," says SAWYER, J., in *Woodruff*
v.. *North Bloomfield Gravel Mining Co.*, *supra*, "a common,
though not a joint right claimed; and the action on the part of
all defendants is the same, in contributing to the common
nuisance. The rights of all involve and depend upon identically
the same question, both of law and fact. It is one of the class
of cases, like bills of peace, and bills founded on analogous
principles, where a single individual may bring a suit against
numerous defendants, where is no joint interest, or title, but
where the questions at issue, and the evidence to establish the
rights of the parties, and the relief demanded are identical."

Professor Pomeroy, in his recent work, ( Pom. Eq. Jur.
§ § 269, 1394, ) after an exhaustive examination of the authorities

in the American courts, sustains the doctrine on the ground of prevention of multiplicity of suits, in bills of this nature, which are not technically "bills of peace," but "are analogous to," or "within the principle of" such bills. "Courts of the highest standing and ability," says the learned writer, "have repeatedly interfered and exercised this jurisdiction, where the individual claims were not only legally separate, but were separate in time, and each arose from an entirely separate and distinct transaction, simply because there was a community of interest among all the claimants in the question at issue and in the remedy."

The same principle is expressly recognized in *Chipman* v. *Palmer*, 77 N. Y. 56, where the court say that "an equitable action will lie to restrain parties who severally contribute to a nuisance," while it holds that they cannot be joined in an action at law. To the same point are *Duke of Buccleugh* v. *Coman*, 5 Macph. 214; *Crossley* v. *Lightowler*, 3 L. R. Eq. 279; *Thorpe* v. *Brumfitt*, 8 L. R. Ch. App. 650.

In the last case a bill was sustained, and a decree granting a perpetual injunction affirmed, against several persons acting individually and severally in obstructing the passage to an inn by loading and unloading wagons. Lord Justice JAMES said: "Then it was said, that the plaintiff alleges an obstruction, caused by several persons acting independently of each other, and does not show what share each had in causing it. It is probably impossible for a person in the plaintiff's position to show this. Nor do I think it necessary that he should show it. The amount of obstruction caused by any one of them might not, if it stood alone, be sufficient to give any ground of complaint, though the amount caused by them all may be a serious injury. Suppose a person leaves a wheelbarrow standing on a way, that may cause no appreciable inconvenience, but if a hundred do so, that may cause a serious inconvenience, which a person, entitled to use the way, has a right to prevent; and it is no defense to any one person among the hundred to say, that what he does causes no damage to the complainant."

In the case at bar, it may be that the act of any one respondent alone might not be sufficient cause for any well grounded

action on the part of the complainants; but when the individual acts of the several respondents, through the combined results of these individual acts, produce appreciable and serious injury, it is a single result, not traceable perhaps to any particular one of these respondents, but a result for which they may be liable in equity as contributing to the common nuisance, as we have before stated. Hence there can be no well founded objection, either upon principle or authority, against this bill upon the ground of misjoinder.

2. The same may be said in relation to the objection urged on account of multifariousness. Here the same relief is asked against all; the same common right is claimed; the same general acts are alleged against all as contributing to the same nuisance. When the object of the bill is single, to establish and obtain relief for one claim, in which all the respondents may be interested, it is not multifarious although the respondents may have different and separate interests. *Bugbee* v. *Sargent*, 23 Maine, 269; *Brinkerhoff* v. *Brown*, 6 Johns. Ch. 157. If the matters are in any material degree blended, so that directly or indirectly they concern all the respondents, the bill is not multifarious. Drewry, Eq. Plead. 42. In *Campbell* v. *Mackay*, 1 M. & C. 543, Lord Cottenham, held that where the plaintiffs have a common interest against all the defendants in a suit as to one or more of the questions raised by it, so as to make them all necessary parties for the purpose of enforcing that common interest, the circumstances of some of the defendants being subject to distinct liabilities, in respect to the different branches of the subject matter, will not render the bill multifarious. Also, *Gaines* v. *Chew*, 2 How. 642.

Therefore, whether the case before us, as disclosed by the allegations may or may not be exactly like any other that has come before the courts, we are satisfied that it falls within the principles of equity enunciated in the cases to which we have referred, and which are not only salutary, but in accordance with reason, and that the bill is not objectionable, on account of misjoinder of respondents, or multifariousness.

3. The next objection urged is that upon the allegations set forth in the bill the complainants show no sufficient grounds to entitle them to equitable relief.

The relief granted by a court of equity is either remedial or preventive. In this case the complainants' prayer is for preventive relief only. It may well be assumed that the facts stated are sufficient to constitute the case of a private nuisance, and to give this court, *prima facie,* jurisdiction over the subject matter and the parties. It is well settled that private nuisances may, under some circumstances, fall within the jurisdiction of a court of equity in reference to obtaining relief from further molestation by restraining the acts which constitute the nuisance.

Nuisances and injuries affecting waters, including the obstruction, diversion or pollution of streams, afford frequent ground for equitable interference, on the principle of restraining irreparable mischief. The jurisdiction of equity in this class of cases may be regarded as ancient and well established. Especially is this true when the acts complained of are of such a character that irreparable injury will result to the complainant without such interference, or when adequate compensation for the injury arising therefrom may not be obtained at law, or, if continued, would lead to a multiplicity of suits. Whenever this is admitted, or established by proof, a court of equity may, by injunction, restrain the continuance of such acts. *Canfield* v. *Andrew,* 54 Vt. 1.

It is true that "it is not every case which would furnish a right of action against a party for a nuisance which will justify the interposition of a court of equity to redress the injury or remove the annoyance." Story, Eq. Jur. § 925. And the general rule, as claimed by the learned counsel for the respondents, is, that where a nuisance is claimed to exist the fact of its existence should, ordinarily, be established by a suit at law before a court of equity will interfere. This rule, however, is not without exceptions. The ground upon which equity takes jurisdiction is that the injury complained of is irreparable, or of such a nature that there is no adequate remedy at law. An examination of the cases which sustain the doctrine of the neces-

sity of the prior interposition of an action at law, admit that in cases of pressing or imperious necessity, or where the right is in danger of being injured or destroyed, or there is no adequate remedy at law, equity will intervene.    *Varney* v. *Pope*, 60 Maine, 195; *Porter* v. *Whitham*, 17 Maine, 294; *Morse* v. *Machias Water Power Co.* 42 Maine, 127, 128; *Parker* v. *Winnipiseogee Lake Co.* 2 Black, 552; *Coe* v. *Winnepisiogee, M'f'g Co.* 37 N. H. 263; Gould on Waters, § 506 and cases cited.

As stated by Chancellor KENT in *Gardner* v. *Newburgh*, 2 Johns. Ch. 165 : " The foundation of jurisdiction in such a case is the necessity of a preventive remedy when great and immediate mischief, or material injury would arise to the comfort and enjoyment of property." The fact that the complainant has not established his right at law is no ground for demurrer to the bill. *Soltan* v. *De Held*, 2 Sim. N. S. 133; *Robeson* v. *Pittenger*, 1. Green Ch. 57; *Holsman* v. *Boiling Spring Co.* 1 McCarter, 335; *Olmsted* v. *Loomis*, 9 N. Y. 432.

And by irreparable injury, is meant one for which there is no adequate remedy at law. Gould on Waters, § 508. " To deprive a plaintiff of the aid of equity by injunction it must also appear that the remedy at law is plain and adequate; in other words, that it is as practical and efficient to secure the ends of justice and its proper and prompt administration as is the remedy in equity. And unless this is shown, a court of equity may lend its extraordinary aid by injunction notwithstanding the existence of a remedy at law." 1 High on Inj. § 30; *Boyce's Exr's* v. *Grundy*, 3 Pet. 215. Especially is this the case where the injury is of such a nature as from its continuance or permanent mischief, must cause a constantly recurring grievance, which cannot otherwise be prevented. Adams, Eq. 211; *Belknap* v. *Trimble*, 3 Paige, 601; *Webber* v. *Gage*, 39 N. H. 186, 187; *Merrifield* v. *Lombard*, 13 Allen, 18; *Cadigan* v. *Brown*, 120 Mass. 494. In such case an action at law affords no adequate remedy, and vexatious litigation and multiplicity of suits, which equity seeks to avoid, would afford just grounds for equitable interference.    *Clark* v. *Stewart*, 56 Wis. 154. The very

difficulty of obtaining substantial damages was stated to be a ground for relief by injunction in *Clowes* v. *Staffordshire Potteries Co.* 8 L. R. Ch. Ap. 125. With still greater force does this apply in a case where the injury is caused by so many, and in such a way, that it would be difficult if not impossible to apportion the damage, or say how far any one may have contributed to the result, and so damages would be but nominal, and repeated actions, without any substantial benefit, might be the result.

In *Lyon* v. *McLaughlin*, 32 Vt. 423, the court say : " When the invasion of a right in this kind of property is threatened and intended which is necessarily to be continuing and operate prospectively and indefinitely, and the extent of the injurious consequences is contingent and doubtful of estimation, the writ of injunction is not only permissible, but is the most appropriate means of remedy. It affords in fact the only adequate and sure remedy. The very doubtfulness as to the extent of the prospective injury and the impossibility of ascertaining the measure of just reparation render such an injury irreparable in the sense of the law relating to this subject."

The court in Massachusetts has very recently had occasion to allude to this question in a case relating to the rights of riparian owners where the waters in a natural stream were polluted, in which case the court say : " The defendant contends that, according to the general principles of the common law, the plaintiff has a complete remedy upon the facts alleged by him, and that he should be compelled to resort to his action at law before seeking relief in equity. But it is quite clear that a bill in equity may be maintained by a riparian owner to restrain another from polluting the stream to the plaintiffs' material injury. *Merrifield* v. *Lombard*, 13 Allen, 16 ; *Woodward* v. *Worcester*, 121 Mass. 245. The acts of the defendant, as alleged, tend to create a nuisance of a continuous nature, for which an action at law can furnish no adequate relief." *Harris* v. *Mackintosh*, 133 Mass. 230.

Equity, as well as the common law, has growth. It is said that prior to Lord ELDON's time injunctions were rarely issued

by courts of equity, but that with the development of equity jurisprudence it has become of frequent use. In the earlier history of the jurisprudence relating to this branch of the law, it was rarely issued in the case of a private nuisance until the plaintiff's right had been established in a suit at law. " But now," say the court in *Campbell* v. *Seaman*, 63 N. Y. 582, "a suit at law is no longer a preliminary, and the right to an injunction, in a proper case, in England and most of the states, is just as fixed and certain as the right to any other provisional remedy. The writ can rightfully be demanded to prevent irreparable injury, interminable litigation and a multiplicity of suits."

II. It remains, then, to be determined from the pleadings and proof whether the allegations are so far supported by the testimony as to entitle the complainants to equitable relief.

A large mass of testimony has been taken in support of the claims set up in the bill, and particularly in reference to the amount of waste that has been discharged into the river from the respondents' mills, and which to a greater or less extent has lodged in the ponds, racks, wheels and raceways of the complainants' mills, thereby causing damage and injury to their property and business, and of which they complain. Much of this testimony is uncontradicted, and fully sustains the allegations in reference to the amount and kind of waste from the respondents' mills, — situated at Fairfield and Somerset Mills,— and with which the water coming into the complainants' ponds is polluted. It is unnecessary to enumerate all the facts established by the testimony. The proof shows that the canal or pond which is about seven hundred feet long, ninety feet in width, and from fifteen to twenty feet deep, situated at the westerly end of the complainants' dam, was so filled with waste, during the space of about six weeks preceding the taking of this testimony, — March 25th to May 12th, — that the complainants were obliged to clear it out from six to eight times, and that several hundred cords were thus removed during that time besides the large quantities that had accumulated and obstructed the raceways. It also shows that they were thus continually troubled with it, and were obliged to shut down their mills on account of

it from one to sixteen times a day, and at times whole days, and to employ from ten to forty and sometimes fifty men in clearing the racks and removing this waste, at an expense for that alone, during the time named, of more than two thousand dollars; occasioning a loss to the employees in their mills, during the month of April, of eight thousand dollars on account of the loss of time resulting from the frequent shutting down of the mills, thereby causing trouble and dissatisfaction. That this had been troubling them every year in the same way since commencing operations in 1876, more at some seasons of the year than other times, but that it had continued each year, notwithstanding they had requested the respondents to cease throwing their waste into the river, and had obtained an act from the legislature prohibiting the throwing of waste and debris into this river, and that they had already on account of this waste been damaged between forty and fifty thousand dollars, and that it was continuing and liable to continue in the future, with increasing damage each year.

The proof further shows that the waste which causes this trouble consists of great quantities of refuse material, sawdust, edgings, shavings, and other debris arising from the operating of respondents' mills, in the manufacture of more than twenty-five millions of lumber annually, besides various other manufactures. It is cast and discharged into the river, and before reaching the complainants' premises commingles and is carried by the action of the water down into their ponds, racks, raceways and wheels, causing the nuisance complained of.

It appears in proof also, that the respondents, and those preceding them, have been accustomed to discharge the waste from their mills into this river for many years, and although they do not strenuously controvert the fact of the great damage to the complainants, they claim that what they do in thus disposing of their waste is but a reasonable use of this river; and if not, then that they have a prescriptive right so to do, and that the complainants contribute to the production of such injury by improperly constructed dams, canals, racks, etc.

From a very careful examination of the testimony we are satisfied that neither of these propositions can be supported by it.

1. These parties are riparian proprietors. They represent the great and important manufacturing industries of our state. While the complainants have a capital of more than two million two hundred thousand dollars invested in the manufacture of cotton, producing one million. five hundred thousand dollars annually, the respondents have invested above them upon the same river in the manufacture of lumber, more than two hundred fifty thousand dollars, and whose annual production is more than six hundred thousand dollars.

However great these industries, or however important to either may be the result of this suit, the rights of the parties to the use of the water in that river are established by well settled principles.

Every proprietor upon a natural stream is entitled to the reasonable use and enjoyment of such stream as it flows through or along his own land, taking into consideration a like reasonable use of such stream by all other proprietors above or below him. The rights of the owners are not absolute but qualified, and each party must exercise his own reasonable use with a just regard to the like reasonable use by all others who may be affected by his acts.. Any diversion or obstruction which substantially and materially diminishes the quantity of water, so that it does not flow as it has been accustomed to, or which defiles and corrupts it so as to. essentially impair its purity, thereby preventing the use of it for any of the reasonable and proper purposes to which it is usually applied, is an infringement of the rights of other owners of land through which the stream flows, and creates a nuisance for which those thereby injured are entitled to a remedy. *Merrifield* v. *Lombard*, 13 Allen, 17.

It is laid down by the courts that the general principles governing the use of running streams in respect to the diversion, obstruction, or detention of water, must also govern in respect to the amount of waste resulting from the process of manufacture. The reasonable use in such cases depends upon the circumstances of each particular case. The law does not lay down any fixed

rule for determining what is a reasonable use of the water of a stream by a riparian proprietor. For domestic, agricultural and manufacturing purposes, to which every riparian owner is entitled, there may be, consistently with that right, some diminution, retardation or acceleration of the natural flow. So in regard to the use of the stream for manufacturing purposes, there must necessarily be more or less waste which it would be impossible to exclude from it, and which by no ordinary care or prudence, could be prevented from falling into the stream. The reasonableness of such use of the water must determine the right, and this must be governed by the extent of detriment received by the riparian proprietors below. See *Hayes* v. *Waldron*, 44 N. H. 580. In the recent case of *Red River Roller Mills* v. *Wright*, 30 Minn. 249, (44 Am. R. 194,) the court say : " In determining what is a reasonable use, regard must be had to the subject matter of the use ; the occasion and manner of its application ; the object, extent, necessity and duration of the use ; the nature and size of the stream ; the kind of business to which it is subservient ; the importance and necessity of the use claimed by one party, and the extent of the injury to the other party ; the state of improvement of the country in regard to mills and machinery, and the use of water as a propelling power ; the general and established usages of the country in similar cases ; and all the other and ever varying circumstances of each particular case, bearing upon the question of the fitness and propriety of the use of the water under consideration."

This case is before us upon report, and it becomes the duty of the court to determine this question of use. All the evidence upon the question of reasonable use, together with all the various circumstances connected with the use of this river by these riparian proprietors, in operating their different mills and manufactories, becomes important in the determination of their respective rights. It is claimed on the part of the respondents that the deposit of a great portion of the waste and refuse material arising from the different manufactures at their mills, into the river, is necessary to their successful operation, and that

the expense and inconvenience to which they would necessarily be put in otherwise disposing of it, would necessitate the shutting down of their mills, and result in a suspension of their business in the manufacture of lumber and other materials. On the other hand, the complainants, as lower proprietors upon the same river, claim an equal right in the use of the water, and from the evidence, show that they are and have been greatly injured in the use of their property, on account of this same waste and refuse material deposited above them by these respondents!

The evidence is such as to leave no doubt in our minds that the use which the respondents have made and are making of this river in reference to the rights of these complainants, is other than a reasonable use of it. What may have been a reasonable use at one time, may not be said to be a reasonable use now. The state of the country, the state of improvement in regard to mills and machinery, and the use of this river as a propelling power, were once far different from what they are to-day. And so in considering the reasonableness of suffering this waste to be deposited in the current above, much must depend upon the use to which the stream below is applied, and the detriment caused to those whose rights, as riparian proprietors, are entitled to just consideration.

The complainants' cotton mills were built, one in 1874, and the other in 1882, where formerly was a saw and grist mill, and at one time a tannery. The racks and wheels which are now connected with these cotton mills, as the proof shows, are of standard and approved construction, and yet very different from those that formerly existed there. The old mills gave way to the advance in manufacturing interests, and to the improvement in the propelling power and machinery necessarily incident to such manufactures.

The vast quantities of debris and waste brought into the complainants' canal, and which they are obliged to remove, thereby seriously interfering with the profitable use of their mills, causing frequent suspension of operations, and occasioning the damage and annoyance to which we have before alluded, justifies us in the conclusion that such is not a reasonable use of this

river by the respondents. And we are equally satisfied that, while it is of great convenience for them thus to dispose of their waste, and considerable expense and great inconvenience would be occasioned by any other disposition of it, it is not absolutely necessary to the operation of their mills that it should be thus deposited in the stream. Other manufacturers of lumber, not only on the Penobscot, but on other principal rivers in this state, dispose of their waste in other ways than by allowing it to pass into the streams. It was otherwise at one time. But the state of improvement of the country, and the springing into existence of other industries, have each had a qualifying influence in determining the reasonable use of such waters.

2. Again. The respondents, claiming a special right to the use of this river, more beneficial to themselves and more burdensome to the riparian proprietors below, than the natural right to the reasonable use of it, must establish such right, either by grant or prescription.

They do not claim it by grant. Have they established such right by prescription? The answer to this does not depend entirely upon proof of the manner in which the respondents have conducted in reference to the operation of their mills, and the disposition of the waste therefrom. In connection with that fact must be considered the situation of the parties, against whom such right is claimed, during the time necessary to the establishment of such right. For it is well settled that in order to establish the presumption of a right or easement in the land or waters of another person, the enjoyment of such right must have been uninterrupted, adverse, under claim of right, and with the knowledge of the owner, or with such acts that knowledge will be presumed. *Parker* v. *Foote*, 19 Wend. 313 ; *Smith* v. *Miller*, 11 Gray, 149 ; *Flora* v. *Carbeau*, 38 N. Y. 115 ; *Gilford* v. *The Winnipiseogee Lake Co.*, 52 N. H. 262 ; Gould on Waters, § § 334, 341 ; Angell on Wat. § 219. And it must have been inconsistent with or contrary to the interest of the owner, and of such a nature that it is difficult or impossible to account for it, except on the presumption of a grant from him, otherwise no such presumption arises. *Morse* v. *Williams*, 62

Maine, 445; *Brace* v. *Yale*, 10 Allen, 444; Gould on Waters, § 334. The prescriptive right to the use of a stream beyond the general right of reasonable use, as against other riparian owners, is governed by the same principles as those in relation to easements in land, and in order to establish such right there must be a perceptible amount of injury throughout the period necessary to gain such right. *Crosby* v. *Bessey*, 49 Maine, 539; *Donnell* v. *Clark*, 19 Maine, 174; *Murgatroyd* v. *Robinson*, 7 El. & Bk. 391, ( 90 E. C. L. 391 ); Gould on Waters, § 346. Nor does the period of limitation begin to run against the owner until there has been an actionable invasion or infringement of a right.

In *Holsman* v. *Boiling Spring Bleaching Co.*, 1 McCarter, 335, the court say: " The defendants have a right to use the water upon their own soil in such manner as they may deem for their interest, provided they discharge it upon the soil of the plaintiffs, in its accustomed channel, pure and unpolluted. They can, therefore, acquire no right by prescription, until they show that the acts which are claimed to constitute the adverse user injured the plaintiffs, and gave to them, or those under whom they claim title, a right of action. The very ground of title by adverse enjoyment, is that the party against whom it is set up, has so long permitted the adverse enjoyment and failed to indicate his rights, that the presumption of a grant is raised. But there can be no such presumption, and consequently no title by adverse enjoyment, where no violation of a right is shown to exist. " See *Pratt* v. *Lamson*, 2 Allen, 288.

And in this case, although the proof establishes the fact that these respondents and those under whom they claim, for more than thirty years have been accustomed to use the waters of this river as a receptacle for the waste from their mills, yet it fails to establish any prescriptive right as against these complainants, or those under whom they claim. The mills now in existence were erected less than ten years prior to the commencement of this suit. Soon after they were built, trouble arose in regard to this waste, and in 1878, these complainants appeared before the legislature and obtained an act to prevent the throwing of refuse

material into the Kennebec river, and which, it appears, these respondents have disregarded.

The use of the water and privilege at Waterville, where these mills are located, prior to 1874, was very different from what it has been since. In 1866, the Ticonic Water Power and Manufacturing Company was organized, and two years later a dam was built at a cost of twenty-three thousand dollars, which is one of those now owned and used by the complainants. In 1869, a saw mill was built and the next year the old grist mill was repaired. Many years prior to that, there had existed a grist mill and saw mill, and a tannery. But prior to the erection of the saw mill in 1869, it does not appear that any trouble had ever been experienced on account of this waste. The testimony of Emery, who built the new dam and who had known the old canal for many years, having worked in the old mills more than forty years ago, is, that "this drift stuff didn't trouble the racks, at the time I worked there, that I remember of." The present canal is shown to be three or four times as large as the old one was. Although it appears that the old one, at the time the new one was built, was more or less filled at the lower end with logs, slabs and mill waste, it does not appear whether it came from the mills once standing there, or from what source.

There appears to have been no complaint made, or injury proved to have been sustained, by any parties owning or operating there, till within a very few years prior to the time when these complainants purchased. The dam and canal, as well as the mills, which formerly existed at that place, were not the same as those of to-day. There could have been no adverse right so long as there was no perceptible amount of injury sustained. What might at the present time occasion not only great inconvenience and annoyance, but also very serious injury, may have been, in the past, of not the slightest detriment to those engaged in other manufactures, with different machinery and more simply constructed appliances with which to utilize the water as a propelling power. In the latter case, no prescriptive right could be gained without the proof of other elements of such right.

Hence, the facts do not establish any right by prescription, or adverse use, by virtue of which the respondents can claim the use of this river otherwise than as riparian owners, entitled to the natural rights and reasonable use thereof legally belonging to them as such.

From a full consideration of this case, it is clear that they have been guilty of an infraction of the complainants' rights; and that from the allegations in the bill, and the proof in support of the same, the latter are entitled to equitable relief. This relief, however, should be against those parties who are shown to have contributed to the injury.

We are not satisfied that the three respondents whose mills are situated at Skowhegan have contributed to the injury complained of. There is some testimony relating to the nature and amount of waste produced at their mills. The quantity is small, however, compared with that which is produced by the other respondents. Furthermore, it would have to pass over a distance of twenty miles in the waters of the Kennebec before reaching the complainants' premises, and the proof is insufficient to satisfy us of the liability of these parties. This fact can be ascertained much better after the mills of the other respondents at Fairfield have ceased depositing their waste in the river, and subsequent experience may make this question more certain; and the complainants should not be prejudiced against enforcing their remedy in relation to them in the future whenever the fact may be established that they contribute to the production of the nuisance.

As against the other respondents a perpetual injunction should issue, in accordance with the prayer in the bill, enjoining them from casting or depositing in the Kennebec river, above the complainants' dams and manufactories, any refuse materials, edgings, shavings, debris, wood refuse and what is denominated long sawdust, — not including, however, common sawdust. In regard to common sawdust, we do not feel satisfied that, at this time, it should be held to be productive of the nuisance; nor should the complainants be prejudiced as to any future action

concerning that under other circumstances, or upon other evidence.

Neither should this injunction issue immediately. The respondents must have a reasonable time in which to prepare for the disposal of such waste as is inhibited from going into the river.

> *Bill dismissed as to Washington B. Bragg, Levi B. Weston and Charles M. Brainard, without prejudice, and without costs for them. Bill sustained as against all the other respondents named therein, with costs, and against whom perpetual injunction is to issue, in accordance with this opinion at the end of four months from the time the rescript in this case shall be received by the clerk of the district in which this suit is pending. Costs to be equally apportioned between the eight different firms represented by the sixteen respondents.*

PETERS, C. J., DANFORTH, VIRGIN, EMERY and HASKELL, JJ., concurred.