P. B. CLOYES, ET AL. *v.* MIDDLEBURY ELECTRIC COMPANY, ET AL.

January Term, 1906.

Present: ROWELL, C. J., TYLER, MUNSON, WATSON, HASELTON, POWERS, and MILES, JJ.

Opinion filed May 15, 1907.

*Water Courses — Artificial Channel — Obstruction — Riparian Rights—Equity Jurisdiction—Parties—Joinder—Multiplicity of Suits.*

Equity has jurisdiction of a suit to restrain the unlawful obstruction of a water course, whereby the lands of riparian owners are flooded, where the injury is necessarily continuous in character and operates

prospectively and indefinitely, or is of such a nature that if continued it will ripen into a right, as in such cases the remedy at law is inadequate.

Nor is it necessary to such jurisdiction that the bill should charge that the conditions resulting from the obstruction are unhealthful, though that alone would be a sufficient ground for equitable interference.

On demurrer to a bill in equity brought by riparian owners to restrain the unlawful obstruction of a stream, where the orators' title to the riparian lands is admitted by the demurrer, it is not necessary that such title should be first established by law; besides, the fact that the orators have not established their right at law is no ground of demurrer.

Where a large number of riparian owners, though each claiming under separate rights, are all, at substantially the same time, similarly injured by a wrongful obstruction of the stream, and the injury to each is such that he can severally resort to a court of equity for protection, they may all properly join in a suit in equity to restrain such obstruction.

Where an artificial channel is substituted for the natural channel of a stream, or created in such circumstances as indicate that it is designed to be permanent, riparian rights may attach to it; and where such change is made by mutual action of the riparian owners, their rights and duties in respect of the artificial channel will be the same as if it were the natural one.

Where a riparian owner makes what is to all appearances a permanent change either in the course of the stream, or within its channel, and holds out to the world the representation that such change is permanent, and other persons acquire rights by changing their position in reliance on that representation, he will be estopped from denying its truth, or claiming that the stream does not flow in its true channel.

The orators are riparian owners, under distinct titles, of lands above a waterfall in a natural stream. In 1804, the orators' respective predecessors in title made a contract with defendants' predecessors, who owned the water power at the falls, whereby the latter agreed to remove certain obstructions that they had put on the falls as a dam, to reduce the falls one foot by the removal of rocks, and to lower their flumes so as never to place any obstruction on the falls, etc., all for the draining of the upper riparian lands. These im-

provements were accordingly made, the upper riparian lands thereby drained were improved, and the stream remained in its altered condition till the defendant electric light company acquired an interest in the falls water power in 1893, when it raised the water two feet by the construction of a dam at the head of the falls, thereby flooding the orators' lands. *Held* that defendants are estopped from altering the fall of the stream in its channel thus artificially improved; and that the orators may properly join in a bill in equity to restrain the obstruction.

The artificial conditions created in the stream as the result of said contract, became the natural conditions, not prescriptively, nor by lapse of time, nor by force of the contract, as such, but by dedication and substitution.

APPEAL IN CHANCERY, Addison County. Heard at Chambers, November 22, 1905, *Watson*, Chancellor. Decree for the orators. The defendants appealed. The opinion fully states the case.

*Ira .H. LaFleur*, and *Stickney, Sargent & Skeels* for the orators.

To unreasonably obstruct a water course is a private nuisance, for which an injunction may be asked in equity. *Koopman* v. *Blodgett*, 70 Mich. 610, 14 Am. St. Rep. 527; *Heilbron* v. *Fowler So. Co.*, 75 Cal. 426, 7 Am. St. Rep. 183; *Ulbricht* v. *Eufala W. Co.*, 86 Ala. 587; *Wheelock* v. *Noonan*, 108 N. Y. 179, 2 Am. St. Rep. 405.

The orators set forth in their bill good ground for relief in a court of equity, for the injury which they complain of is permanent and continuous in its nature, and amounts to the destruction of the value of each of their lands so long as it is maintained, and if maintained, it will ripen into prescriptive rights. The remedy in equity alone is adequate and adapted to reach the justice of the case. *Lyon* v. *McLaughlin*, 32 Vt. 423; *Canfield* v. *Andrews*, 54 Vt. 1; *Waterman* v. *Buck*, 58 Vt. 519; *Ames* v. *Dorset Mar. Co.*, 64 Vt. 10; *Turner* v. *Hart*, 71 Mich. 128, 15 Am. St. Rep. 243; *Miss. Mills Co.* v. *Smith*, 69 Miss. 299, 30 Am. St. Rep. 546; *Bemis* v. *Upham*, 13 Pick. 169; *Rothery* v. *N. Y. Rubber Co.*, 90 N. Y. 32.

The instances are numerous in which courts of equity have taken jurisdiction in such cases, avowedly on the ground of preventing a multiplicity of suits, and have given complete relief to all the injured proprietors by a single decree. 1 Poll. Eq. S. 257; *Reid* v. *Gifford*, Hopk. 416; *Murray* v. *Hay*, 1 Barb. Ch. 59, 43 Am. Dec. 773; *Cardigan* v. *Brown*, 120 Mass. 493; *Ballou* v. *Hopkington*, 4 Gray 324; *Smith* v. *Smith*, 148 Mass. 1; *Osborne* v. *Wis. Cen. R. R. Co.*, 43 Fed. 824; *DeForrest* v. *Thompson*, 40 Fed. 375; *Earl* v. *DeHart*, 1 Beasley's Ch. (N. J.) 280, 72 Am. Dec. 395.

*W. H. Davis* and *W. H. Bliss* for the defendants.

In order to give the court of chancery jurisdiction to grant injunction in a case like this the right must first be established by suit at law. *Prentiss* v. *Larned*, 11 Vt. 135; Angell, Water Courses, §444; *Fair Haven, etc. Co.* v. *Adams*, 46 Vt. 496; 2 Farnham, Waters, 1624, §483; *Sheboygan* v. *Sheboygan, etc. Co.*, 21 Wis. 667.

The orators are improperly joined, since their claims are several and distinct. *Exeter College* v. *Rowland*, 6 Madd. 94; *Harrison* v. *Hogg*, 2 Ves. Jr. 323; *Morris, etc. Co.* v. *Prudden*, 20 N. J. Eq. 530; *Barham* v. *Hostetter*, 67 Cal. 272; *Foreman* v. *Boyle*, 88 Cal. 290; *Stobel* v. *Kerr Salt Co.*, 164 N. Y. 303; *Palmer* v. *Waddell*, 22 Kan. 352; *Hudson* v. *Com.*, 12 Kan. 140; *Stevenson* v. *Plow Co.*, 14 Kan. 387; *Schultz* v. *Winter*, 7 Nev. 130; *Grant* v. *Schmidt*, 22 Minn. 1; *Hellams* v. *Switzer*, 24 S. C. 29; *Marselis* v. *Morris Canal etc. Co.*, 1 N. J. Eq. 31.

POWERS, J.   We learn from this bill that a natural water course known as Otter Creek flows northerly through Rutland and Addison counties and empties into Lake Champlain at Vergennes.   The orators, eighty-eight in number, are the owners in severalty of certain farms and lowlands lying along the stream in the town of Middlebury and other towns south of Middlebury and higher up on the stream.   There is a natural falls at Middlebury Village, which has for a great many years furnished power for various industries, and which is now owned and utilized by the defendants.   In 1804, the parties then owning the riparian lands above said falls, (a part of which are now

owned by the orators), entered into an arrangement with the parties then owning the power and rights on the falls, pursuant to which they procured the passage of an Act of the Legislature assessing a tax on such riparian lands according to the benefits thereto of the improvements contemplated by said arrangement, appointing assessors to appraise such benefits, a collector to collect such tax, and a committee of five to receive and to expend the money so raised, for the purpose of carrying out the provisions of the contract hereinafter set forth. The assessors proceeded to appraise said benefits, and assessed a tax on said lands sufficient to raise the sum of $2,000.00, which was collected and paid over to the committee named in the Act. Thereupon, the parties then owning said lands appointed this committee of five as their committee to represent them in the making and execution of a contract with the owners of said power and rights. Pursuant to this arrangement, the committee and the power owners on the tenth day of March, 1806, made, executed in the presence of two witnesses, and caused to be recorded in the office of the town clerk of Middlebury, a contract, which, so far as material here, reads as follows:

"Whereas, the waterworks situated in Middlebury Falls upon Otter Creek, cannot at all times have sufficient supply of water without a dam on said falls; and whereas, it is supposed that such dam on said falls by raising the creek above the falls does a material injury to the lowlands on said creek; and whereas, the owners of lowlands between said falls in Middlebury and Sutherlands' Falls in Rutland conceive that it would prove highly beneficial to said lands to lower said falls in Middlebury so as to reduce said creek to its natural level; therefore, for the mutual accommodation of the owners of said waterworks and the owners of said lands, it is agreed mutually by and between Gamaliel Painter, Artemas Nixon, Daniel Henshaw, John Warner, and Jonathan M. Young, owners of said water works, and Daniel Chipman, Darius Matthews, Henry Olin, Benejah Douglas and Levi Walker, a committee appointed by said land owners, that the said owners of said works will, during the summer of the year of our Lord, 1806, remove all obstructions which they have put on said falls as a dam to stop the water, between the south-west corner post of said Gamaliel's mill and Daniel Henshaw's flume; that they will reduce the falls one

8

foot on a level below a certain mark made on said falls by Henry Olin and Benejah Douglas; that they will remove certain rocks that project out below the top of said falls towards the south side of said creek, so that the·water may fall from the top without obstruction; that they will lower their flumes so as never to place any dam or obstruction on said falls, and that they will at all times permit any of said land owners, or any person by them appointed to remove any obstructions which may accidentally or otherwise be lodged on the rocks at the head of said falls, between the said post at the south-west corner of said Gamaliel Painter's mills, as now erected, and the flume of the said Daniel Henshaw, as they now stand. For which the owners of said lands ·agree to pay the said mill owners one thousand dollars, one-half of which shall be paid by the first day of July next, and the other half by the first day of October, A. D. 1806; that is to say, the one-half of said one thousand dollars to be paid to Gamaliel Painter, and the other half to be paid to Artemas Nixon, Daniel Henshaw, John Warner and Jonathan M. Young; provided the said work shall then be completed. And it is further agreed that the land owners shall, during the summer of 1806 and 1807, make the stream as convenient for rafting logs from against the north-east corner of Ebenezer Markham's farm, (as it now stands), to the lower side of the bridge, as it would be if the rocks at the head of the falls were not to be reduced. And it is further agreed that the said land owners, at any and all times hereafter have liberty to lower the rocks and rapids in said creek as they shall think proper at any place or places above the lower side of the bridge now erected across said creek near the falls, and that William Goodrich, William Young and Nathaniel Ripley be appointed as a committee to say whether any, and if any, what and how much, shall be done to the channel on each side of the creek to make it as good for rafting logs as if the rocks on the head of said falls were not altered; and if by death or any other accident either or all of said committee be unable to attend said business, the Supreme Court of this State on application of either or both of said parties to this contract, have power to appoint, at any session of said Court in the county of Addison, one or more person or persons to take his or their place or places and execute said charge. And it is further agreed that the said land owners shall indemnify and save harmless the said

mill owners from all damages they may sustain by being sued or prosecuted by any person or persons for lowering said falls.''

The water power owners thereupon removed from the falls the obstructions thereon, broke off and removed the projecting rocks, and lowered the falls in accordance with the requirements of this contract. The result was that the aforesaid lowlands were drained and made tillable, and became and are very valuable for agricultural purposes.

. After the falls were lowered in this way, they remained as that work left them for a period of more than eighty years, during all which time said lands have been used, cultivated and occupied by their respective owners under a claim of right to have them so remain.

The Middlebury Electric Company, one of the defendants, having purchased an interest in said water power, erected at the head of said falls in 1893 a wooden dam, and thereby raised the water upon said falls about two feet higher than it had been accustomed to flow since the removal of the obstructions as aforesaid; in consequence of which said lowlands were overflowed and rendered valueless for agricultural purposes, and unwholesome effluvia and miasma caused to arise therefrom, rendering the dwellings of the orators unhealthful and unfit for occupancy. The other defendants are the owners of certain interests in said power, and all are now maintaining the dam aforesaid.

The orators have frequently protested to the defendants against the maintenance of the dam and have even attempted to remove it by force, without avail.

The bill alleges that each of the orators suffers a common injury by the alleged wrongful maintenance of the dam, that the cause of complaint is common to all and the same to each, that any defence made will be common to all the orators, and that the testimony, proofs and decrees will be alike as to all the orators except as to the amount of damages.

The prayer is for a decree establishing the orators' right to have the falls continue free from dam or obstructions, as left in 1806, ordering the defendants to remove the present obstruction from the falls, restraining them from erecting or maintaining any such obstructions; for an accounting of damages with each of the orators, and for general relief. The bill is demurred to.

I.    That a court of equity has jurisdiction of the subject-matter of this suit cannot well be questioned.  The character of the injury caused by the unlawful obstruction of a water course, whereby the lands of riparian owners are flooded, is usually such as to bring the matter within the jurisdiction of that court.  To be sure, it must appear in such cases that the remedy at law is inadequate; but such remedy is inadequate, in a legal sense, when the injury suffered by the land owner is necessarily continuous in character and operates prospectively and indefinitely,—*Lyon* v. *McLaughlin,* 32 Vt. 423,—or is of such a character that if continued would ripen into a right,— *Canfield* v. *Andrews,* 54 Vt. 1.  So, though it is not in every case of this kind that a court of equity will interfere, when the injury is substantial rather than trivial, and permanent rather than temporary, it will readily lend its aid to one whose rights have been so invaded.  And that is the case made by this bill, without regard to the allegations showing conditions dangerous to health, which of themselves make a proper cause for equitable interference.  2 Farnh. Wat. §582; *Holsman* v. *Spring Co.,* 14 N. J. Eq. 335.

Nor, in a case like this, is it necessary that the right should be first established at law.  The title to the riparian lands being admitted by the demurrer, the right to have the waters of the stream flow through them free from unlawful obstruction is clear, and the necessity for immediate action urgent.  In these circumstances, a court of equity will not hesitate to take jurisdiction.  *Lockwood Co.* v. *Lawrence,* 77 Me. 297, 52 Am. Rep. 763; *Olmstead* v. *Loomis,* 9 N. Y. 432; *Reid* v. *Gifford,* Hop. Ch. 416; *Robeson* v. *Pittenger,* 2 N. J. Eq. 57; *Vaughn* v. *Law,* 1 Humph. (Tenn.) 123.  Besides, it is held that the fact that the complainant has not established his right at law is no ground for a demurrer.  *Lockwood Co.* v. *Lawrence, supra; Soltau* v. *De Held,* 2 Sim. (N. S.) 133.  This is shown by *Griffith* v. *Hilliard,* 64 Vt. at p. 646, 25 Atl. 427, where it is held that even in cases where the orator's title is disputed, the court of chancery may proceed and determine which party has the better title.  And once equity has taken jurisdiction of a case like this, it will retain it for all purposes and dispose of the whole matter, even to the assessment of damages.  *Whipple* v. *Fairhaven,* 63 Vt. 221, 21 Atl. 533; 6 Pom. Eq. §562; *Roberts* v. *Vest,* 126 Ala. 355.  The fact that the parties are numerous

is not an insurmountable embarrassment. It did not deter the court of chancery from working out the rights of the parties in *Waterman* v. *Buck*, 58 Vt. 519, 3 Atl. 505.

II. Can the orators join in the bill? If they can, it is solely upon the ground of preventing a multiplicity of suits.

Prof. Pomeroy reduces all possible conditions in which a multiplicity of suits can arise to four classes. His third class is: "Where a number of persons have separate and individual claims and rights of action against the same party, A, but all arise from some common cause, are governed by the same legal rule, and involve similar facts, and the whole matter might be settled in a single suit, brought by all these persons uniting as co-plaintiffs, or one of these persons suing on behalf of the others, or even by one person suing for himself alone." His fourth class is the converse of this: "Where the same party, A, has or claims to have some common right against a number of persons, the establishment of which would regularly require a separate action brought by him against each of these persons, or brought by each of them against him, and instead thereof he might procure the whole to be determined in one suit brought by himself against all the adverse claimants as co-defendants." 1 Pom. Eq. §245.

In discussing the cases which properly fall within these classes, he says (§269a) that "under the greatest diversity of circumstances and the greatest variety of claims, arising from unauthorized public acts, invasion of property rights, violations of contract obligations, and notwithstanding the positive denials by some American courts, the weight of authority is simply overwhelming that the jurisdiction may and should be exercised, either on behalf of the numerous body of separate claimants against a single party, or on behalf of a single party against such a numerous body, although there is no 'common title,' nor 'community of right,' or of 'interest in the subject-matter,' among these individuals, but where there is and because there is merely a community of interest among them in the questions of law and fact involved in the general controversy, or in the kind and form of relief demanded and obtained by or against each individual member of the numerous body." "In a majority of the decided cases," he says, "this community of interest in the questions at issue and in the kind of relief sought has originated from the fact that the separate claims of all the in-

dividuals comprising the body arose by means of the same unauthorized, unlawful or illegal act or proceeding.'' ''Even this external feature of unity however,'' he continues, ''has not always existed, and is not deemed essential. Courts of the highest standing and ability have repeatedly interfered and exercised this jurisdiction, when the individual claims were not only legally separate, but were separate in time, and each arose from an entirely separate and distinct transaction, simply because there was a community of interest among all the claimants in the question at issue and in the remedy.''

If all this be so, individuals could join in a bill, regardless of whether they could severally resort to equity.

This proposition is vigorously denied in *Tribette* v. *Railroad Co.,* 70 Miss. 185, 35 Am. St. Rep. 642, wherein it is said that there is no such doctrine in the books, and that Prof. Pomeroy's zeal to maintain a theory has betrayed him into error, and so blinded him as to cause him to confound two distinct things:— joinder of parties and avoidance of a multiplicity of suits. The true doctrine is there said to be, that the mere fact that there is a community of interest in the questions of law and fact presented by a given controversy, or in the kind and form of relief demanded by or against each of several individuals will not warrant equitable· interposition, unless the questions involved are of equitable cognizance; that when each of several so situated may proceed or be proceeded against in equity, their joinder as plaintiffs or defendants is not objectionable.

Mr. Freeman, in his note to *Woodward* v. *Seeley,* 50 Am. Dec. at p. 452, apparently approves the Pomeroy Rule, for he quotes a part of the language above set forth, and says that Prof. Pomeroy discusses this whole subject of the equity jurisdiction to prevent a multiplicity of suits with great learning, clearness and vigor.

It is not necessary to a determination of the question now presented that we should become involved in any controversy over the true scope and extent of the rule under discussion, for here the matters involved are, as we have seen, of equitable cognizance, and the injury complained of is of that character that each of the orators could have resorted to the court of equity for the establishment and protection of his rights. · Nor is it necessary that we adopt the rule, even as modified by the Mississippi Court, and approve the statement that the jurisdic-

tion exists when the individual claims arise from entirely separate and distinct transactions; for here we need only go to the extent of holding that in order to warrant the joinder, the wrongful act, being of equitable cognizance, must also be of such a character as to necessarily fall upon all the orators simultaneously, affecting all in the same way, though not necessarily to the same extent. And by "simultaneously" is here meant, not at the very same instant, but at substantially the same time. This proposition is, we feel confident, safely within the authorities and embraces the case made by this bill. Indeed, a more apt illustration of the proper application of the rule could hardly be found.

From the vast number of cases to which this rule has been applied by the courts of this country, the following are selected by way of example:

In *Murray* v. *Hay,* 1 Barb. Ch. 59, it was held that two persons owning separate tenements, which are injured or rendered uninhabitable by a common nuisance, or which are rendered less valuable by a private nuisance which is a common injury to the tenements of both, may join in a suit to restrain such nuisance. To the same effect are *Madison* v. *D. S. C. & I. Co.* (Tenn.) 83 S. W. 658, and *Grant* v. *Schmidt,* 22 Minn. 1.

In *Cadigan* v. *Brown,* 120 Mass. 493, it was held that several persons owning distinct properties to which there was a common right of way, could join in a suit to prevent the obstruction of such right of way.

In *Parker* v. *Nightingale,* 6 Allen 341, it was held that the several owners of lots on Hayward Place, holding under titles which provided that no buildings except dwellings should be erected thereon, could join to prevent the defendant from violating the restriction.

In *Rafferty* v. *Traction Co.,* 147 Pa. St. 579, 30 Am. St. Rep. 763, the separate owners of property fronting on High street in the city of Pittsburgh were allowed to join in a bill to restrain the defendant from operating a cable railway on that street.

In *Lonsdale* v. *Cook,* (R. I.) 44 Atl. 929, it was held that where several persons have a common interest in the prevention of the diversion of the waters of a stream from their respective mill privileges, they may join in a bill to enjoin it, though they hold under distinct titles and claim independent interests.

In *Reid* v. *Gifford,* Hopk. Ch. 416, the separate riparian and mill owners were allowed to join in a bill to prevent the diversion of the waters of the stream.

In *Strobel* v. *Salt Co.,* 164 N. Y. 303, 51 L. R. A. 687, it was held that riparian proprietors, each owning distinct parcels of land on a natural water course, have a common grievance which entitles them to join in a suit to prevent the pollution of the stream.

In *Gillespie* v. *Forrest,* 18 Hun. 110, it was held that all whose lands were overflowed and injured by the erection of piers in a stream could join in a bill against the party erecting them.

In *Turner* v. *Hart,* 71 Mich. 128, 15 Am. St. Rep. 243, it was held that separate riparian owners could join in a bill to restrain the maintenance of a dam causing their several lands to be overflowed and practically destroyed.

It is true that of these cases, *Murray* v. *Hay, Grant* v. *Schmidt,* and *Turner* v. *Hart,* show that an accounting could not be had in such cases in the jurisdictions where those cases arose. But under our practice in equity such accounting can be had as an incident of the general relief granted.

The "community of interest" between the complainants in the foregoing cases, is much like that between the plaintiffs in *Coryton* v. *Lithebye,* 2 Saund. 115, and the *Tunbridge Well Case,* 2 Wils. 423, in which cases, even in actions at law—where all agree the rule is less liberal—the plaintiffs were held properly joined.

In the former, the plaintiffs owned separate mills, and had acquired by custom the right to have ground at the one mill or the other all the grain of the tenants of the manor of Calliland. The defendant, one of the tenants, withheld his grain from these mills, and procured it to be ground elsewhere. Whereupon the plaintiffs brought an action for damages.

In the latter, the plaintiffs, twelve in number, were dippers at the Tunbridge Wells, chosen by the freeholders of the manor and approved by the lord of the manor. Their business was to attend the Wells and deliver the water to those who resorted there. Their profits arose solely from the voluntary contributions of the visitors. When the defendant, not being properly appointed a dipper, dipped of the waters, the others joined in an action for damages.

The same rule applies to the joinder of defendants; as where several riparian owners, acting independently, discharge mill refuse into a stream to the injury of a lower proprietor. *Lockwood Co.* v. *Lawrence,* 77 Me. 297, 52 Am. St. Rep. 763. Such a case was *Waterman* v. *Buck, supra.*

And, conversely, it is held that when several plaintiffs have separately sued the same defendant- in actions at law for a continuing trespass, and his liability in each action depends upon the same facts, equity has jurisdiction to enjoin the multiplicity of actions and have them consolidated in the same suit. *Railroad Co.* v. *Garrison,* 81 Miss. 257, 95 Am. St. Rep. 469.

III.   The removal of the obstructions to the flow of the stream pursuant to the contract hereinbefore set forth created an artificial condition in the channel, and the rights and liabilities of riparian owners in respect of artificial water courses are not necessarily the same as in the case of natural streams,—though they' may be. This depends upon the circumstances under which the artificial condition was created or continued. If an artificial channel is substituted for a natural one, or if it is created under such circumstances as indicate that it is to be permanent, riparian rights may attach to it. Pollock, C. B. in *Wood* v. *Waud,* 3 Ex. 779; *Railway Co.* v. *Keys,* 55 Kan. 205, 49 Am. St. Rep. 249. If such change is made by joint or mutual action of the riparian proprietors, the rights and duties with respect to the artificial channel will be the same as though it was. the natural one. 3 Farnh. Wat. §827a. This principle might suffice for the disposition of this question, but we are not content to place it there. This change was made by the concurrent action of the parties under a contract mutually agreed to and executed on both sides,—at least so far as it related to the changes in the stream,—but it was all on the lands of the defendants' grantors, and the contract, as such, was not binding on these defendants. Some of the cases hold that after the artificial channel has been maintained for the statutory period, reciprocal prescriptive rights to have it continued arise. *Matthewson* v. *Hoffman,* 77 Mich. 420, 6 L. R. A. 349; *Smith* v. *Youmans,* (Wis.) 37 L. R. A. 285; *Kray* v. *Muggli,* (Minn.) 54 L. R. A. 473. But the agreement here negatives the adverse character of the right enjoyed by the orators and their grantors, and the technical doctrine of prescription is inapplicable. It is said that there is a much more impregnable ground on which to put such decisions,

and that is the ground of estoppel. And if a land owner makes a change in the course of a stream which to all appearances is permanent, and holds out to the world the representation that such condition is permanent, he will be bound by his acts; and after other persons have acquired rights by changing their positions upon the faith of such representation, he will be estopped from denying that it was true, or claiming that the stream is not flowing in its true channel. 3 Farnh. Wat. §827c. This reasoning is in entire harmony with our own decisions in cases of like character.

In *Woodbury* v. *Short,* 17 Vt. 387, it was held that when the course of a stream, running through the land of the defendant to that of the plaintiff, was changed by a sudden flood, so as to run upon the defendant's land without passing over that of the plaintiff, and the defendant permitted it to flow in the new channel for a period of ten years, he could not turn it back into the old channel. This decision was put upon the ground of acquiescence, and the court said that if the defendant would restore the stream to its original channel, he must act within a reasonable time and before new interests would naturally be acquired in the new course in which he had permitted it to run.

In *Ford* v. *Whitlock,* 27 Vt. 265, the same question, except that the change in the stream was made by the owner of the land —a stronger case against its restoration—again came before the court, and the right to restore the stream to its natural channel to the injury of other riparian owners was denied. "It seems to us," says Judge Redfield in the opinion, "analogous to the rules of law which have been applied to dedications to public use, of land or the use of land; and it seems to be highly equitable and just, that where one has by his own act, either originally changed the course of the stream, or suffered it to remain in a channel cut by some sudden convulsion, until others have expended money in erections, as in the present case, in faith of the stream running in the new channel, or, as in the case of *Woodbury* v. *Short,* may be supposed to have done so, that the stream should not then be allowed to be restored to its former channel to the detriment of other riparian proprietors. * * * But the law as to running streams is also analogous to public rights like highways and commons, inasmuch as a large number of persons have an interest in fresh water streams, and they are therefore *quasi* of public concern, and the rules of public dedi-

cations have been applied to an acquiescence in a new bed for such stream; and one who cuts such bed on his own land and thereby renders the use of the stream beneficial to other proprietors, in a different mode, is bound to the same extent and in as short a period, as if he alters the fence on a highway or common, and thereby gives privileges to the public. He cannot often recall them after the shortest term. Any term is sufficient, which satisfies the jury that the public were justified in treating it as a dedication.''

This is the doctrine of *Delaney* v. *Boston*, 2 Har. (Del.) 489, wherein it was held that riparian proprietors had a right, by dedication and substitution, to have the waters of a stream flow through an artificial channel which had been cut by a lower owner fifty years before.

It makes no difference that the changes here were made within the channel of the stream, instead of by making a new channel. The rule is precisely the same. 3 Farnh. Wat. §287c. The riparian owners are entitled to the benefit of any such change which may have been made, if they were apparently intended to be permanent, and such owners have acted upon the faith of the conditions so remaining. In *Paige* v. *Canal & Irrig. Co.*, 83 Cal. 84, it was held, upon the authority of *Woodbury* v. *Short* and *Ford* v. *Whitlock*, that a riparian owner is entitled to the benefit of the removal of obstructions from the head of the stream which had prevented the water from flowing down to his land. *Chapman* v. *Mfg. Co.*, 13 Conn. 269, 33 Am. Dec. 401.

It matters very little whether we call it a dedication or an estoppel, for the underlying principle of each is the same—the injustice of allowing one to deny the existence of conditions which by his conduct he has induced another to believe exist, in reliance upon which that other has changed his position.

The artificial conditions created in the Creek at Middlebury became the natural conditions,—not prescriptively, nor by lapse of time, nor by grant contained in the contract, nor by force of the contract, as such, at all; but by force of the circumstances under which they were created,—by dedication and substitution. The contract, (which gained nothing by being recorded, since it was not entitled to record), affords evidence of the intention to make the changes permanent,—a dedication for all time. The right of the then riparian owners to have the new conditions continue attached at once upon the completion of the work. It

attached to all the riparian lands, and became rooted in them, whether owned by those who were parties to the contract, or not. It now belongs to the orators by virtue of their ownership of riparian lands,—as an incident to such ownership,—whether they derived their titles from those who then owned the lands, or not. It came to them as the fertility of the soil came to them,— not because it was expressly granted, but as a natural appurtenant.

*The pro forma decree overruling the demurrer and adjudging the bill sufficient is affirmed with costs to the orators. The decree for the orators according to the prayer of the bill is reversed, pro forma, and the cause is remanded.*