Cheshire,  }
April 5, 1910. }

## Taggart *v.* Jaffrey.

Where the waters from a pond have for more than sixty years flowed in an artificial channel which was prepared for them with the intention of permanently altering the course of the stream, a landowner on such channel is entitled to all the riparian rights of an owner on a natural water-course.

Where the bed of a stream from a great pond has been conveyed to private proprietors, the water of the pond cannot be diverted for a public use without compensation to a riparian owner who is damaged thereby.

Where an offer of proof is ambiguous and the evidence is erroneously excluded through a misunderstanding of the presiding justice, the remedy of the party aggrieved is an application to the superior court for a new trial, on the ground of accident or mistake.

Petition, for the assessment of damages caused by taking water from Bullet pond. Facts agreed.

Prior to 1902, water from Bullet pond, after passing through Grassy pond and along a natural stream, flowed in an artificial channel cut through some rising ground and thence along a natural depression past the plaintiff's premises. The water was diverted to this channel by a dam across the natural water-course, and has flowed in this artificial channel for over sixty years. Who

built it, and when and by whom the water was diverted thereto, did not appear; but it was constructed and kept in repair to carry water to several mills below where the plaintiff lives. In 1888, the plaintiff took title to his premises and built a house and out-buildings. There were no buildings on the premises before that time. From then until 1901, the plaintiff took water by pails from this stream for domestic purposes. In 1901, he constructed a ram which forced the water through pipes to his buildings. In the fall of 1902, the town of Jaffrey began to draw water from Bullet pond under the provisions of chapter 255, Laws 1901, and caused the alleged depletion of the water in the stream of which the plaintiff complains.

When the plaintiff bought he believed the artificial channel to be a permanent structure; and for sixty years or more it has appeared to be such, although it required annual repairing. The plaintiff claimed the rights of a riparian owner upon a natural stream; and by agreement of the parties this question was trans-ferred without ruling by *Pike*, J., from the April term, 1909, of the superior court. The damages were assessed by a jury. Excep-tions to evidence on this branch of the case are stated in the opinion.

*Doyle & Lucier* (*Mr. Lucier* orally), for the plaintiff.

*Cain & Benton* (*Mr. Benton* orally), for the defendants.

PEASLEE, J. The waters flowing from Bullet pond were diverted from their natural channel more than sixty years ago, and have since flowed in the channel then prepared for them. The change was evidently intended to be permanent, and the present channel of the stream is now, for all legal purposes, its natural one. "It has often been decided, both in England and America, that water-courses made by the hand of man may have been cre-ated under such conditions that, so far as the rules of law and the rights of the public or of individuals are concerned, they are to be treated as if they were of natural origin." *Stinson* v. *Brookline*, 197 Mass. 568; *Townsend* v. *McDonald*, 12 N. Y. 381; *Magor* v. *Chadwick*, 11 A. & E. 571, 586; *Sutcliffe* v. *Booth*, 9 Jur. N. S. 1037; 3 Farn. Wat., s. 827 b.

Cases involving the rights of proprietors along artificial streams, as distinguished from natural streams running in artificial courses, are not in point. The distinction between the two has often been recognized. *Murchie* v. *Gates*, 78 Me. 300; *Stinson* v. *Brookline*, *supra*; *Nuttall* v. *Bracewell*, L. R. 2 Exch. 1; *Wood* v. *Waud*, 3 Exch. 748, 777.

Rights in new courses for natural streams have been supported upon various grounds.

"When a stream flowing through a person's land is diverted into a new channel, either artificially or by a sudden flood, affecting the rights of other riparian proprietors favorably, and the owner acquiesces in the new state of the stream for so long a time that new rights accrue, or may be presumed to have accrued, such acquiescence is binding, like a public dedication, and the stream cannot be lawfully returned to its former channel." Gould Wat., s. 159; *Ford* v. *Whitlock*, 27 Vt. 265; *Burk* v. *Simonson*, 104 Ind. 173.

In some cases the mere running of the water for the prescriptive period, under conditions apparently intended to be permanent, has been considered sufficient to warrant a holding that the usual riparian rights along a natural stream have attached. *Murchie* v. *Gates*, 78 Me. 300; *Gaved* v. *Martyn*, 19 C. B. N. S. 732.

"There is a much more impregnable foundation [than prescription] upon which to put such decisions, and that is upon the ground of estoppel. If the landowner makes a change in the course of the stream which to all appearance is permanent, and holds out to the world the representation that such condition is permanent, he will be bound by his acts; and after other persons have acquired rights by changing their positions upon the faith of such representations, he will not be permitted to deny that they were true, or claim that the stream is not flowing in its true channel." 3 Farn. Wat., s. 827c; *Woodbury* v. *Short*, 17 Vt. 387; *Lapman* v. *Milks*, 21 N. Y. 505; *Lamott* v. *Ewers*, 106 Ind. 310.

"If the landowner, having changed the direction of the natural stream through his land, were to suffer others who are entitled to use the water to expend money in reference to such use, under a belief that the new channel was to be permanent, and this were known to him, he could not afterwards change its course so as to injure the party who had expended his money. In these and like cases, whenever one who owns a water-course in which another is interested, or by the use of which another is affected, does any act, or suffers any act to be done, affecting the rights of other proprietors, whereby a state of things is created which he cannot change without materially injuring another who has been led to act by what he himself had done or permitted, the court applies the doctrine of equitable estoppel." *Shepardson* v. *Perkins*, 58 N. H. 354, 356. Whether this case is fairly open to criticism because of an attempt to sustain the conclusion reached by inconsistent lines of reasoning (3 Farn. Wat., s. 827), it is not now necessary to inquire.

The rule is universal that riparian rights may be acquired along

the artificial channel of a natural stream. Upon any of the grounds suggested, this plaintiff could maintain his position. There was a dedication. The stream had been changed in a manner to indicate that the alteration was permanent. There are prescriptive rights. It ran in this way for more than twice the period necessary to the presumption of a grant before the plaintiff purchased his tract of land. There is an estoppel. He relied upon the apparently permanent conditions when he made his purchase; and since that time, and acting upon conditions as they were, he has openly made the improvements which he says are now interfered with. That he has the rights of a riparian proprietor upon a natural watercourse cannot be open to serious question.

The cases relied upon by the defendant (*Fox River etc. Co. v. Kelley*, 70 Wis. 287; *Lawson v. Mowry*, 52 Wis. 219) are not applicable here. The law of Wisconsin is in harmony with that elsewhere. In a recent case in that state many of the American authorities are quoted with approval, and the court declares the law to be that "the water-course, though artificial, may have originated under such circumstances as to give rise to all the rights that riparian proprietors have in a natural and permanent stream, or have been so long used as to become a natural water-course prescriptively." *Smith v. Youmans*, 96 Wis. 103, 109.

While in a case like this the right acquired includes the privilege of taking water for domestic use (*Roberts v. Richards*, 44 L. T. 271), the defendant is in error in basing its argument upon the proposition that the complaint is for the interference with such right. There is no suggestion in the case that there is not at all times sufficient water in the stream to supply the plaintiff's domestic needs. The complaint is for loss of power to drive the plaintiff's hydraulic ram. The depletion of the water-power is the wrong for which compensation is sought.

The defendant also sets up the claim that "the waters in the pond were public waters and could be used by the state or any particular subdivision of it for any public purpose without compensation to the plaintiff." The law is otherwise. The bed of the pond is the property of the state. "Before the township was granted, the public held not only the basin of the pond, but also the bed, banks, and valley of the brook that flows from the pond to the river. In that position of the title, the public owner could divert the entire pond from its outlet without infringing private rights between the pond and the river. If the original title to the valley had remained unchanged, this suit could not be maintained. But the public owner elected to convert into private property the mill site. . . . The grant of the bed of the brook to private proprietors, whose title has come to the plaintiffs, conveyed rights

of air, light, heat, and water. . . . If the original owner had desired to retain an unlimited right to divert the pond and destroy the mill privilege, there should have been an express reservation. A right to the natural flow of the brook, not unreasonably diminished or polluted, was inherent in the land, and one of the rights of use and occupation of which the title was composed. . . . By an elementary rule of conveyancing, it passed from grantor to grantee, in the absence of a stipulation to the contrary. The operation of the rule did not depend upon the question whether the water was a natural pond, large or small, before it entered the plaintiffs' lot. . . . If the plaintiffs have been injured by an unreasonable use of the pond, or of any other lot of land or water, there is a legal remedy." *Concord Mfg. Co.* v. *Robertson,* 66 N. H. 1, 29.

2. Exception was taken to the exclusion of certain evidence. The defendant was urging that the plaintiff ought to conserve the surplus waters for use in dry seasons, and was offering evidence as to how this might be done. It was then suggested that it did not appear that the plaintiff had any right to control or repair the structures referred to. The court then caused the following statement to be entered upon the record: " The evidence introduced, whereby it is claimed that the plaintiff could have conserved the water at Rugg meadow and Grassy pond, is excluded." The defendant then made the following offer of proof: " We offer the evidence excluded and other evidence tending to show that if the plaintiff, or the persons having control of the canal and the dam at Rugg meadow and Grassy pond, maintained the structures for the conservation of water at those places as they stood several years ago, the stream flowing past Taggart's house would be fed at all seasons of the year so that he would have sufficient water to run his ram. The evidence is offered upon the ground that Taggart's claim to recover is based upon his claim to rights in the canal, and on the further ground that the defendant is entitled to show that the damage of which the plaintiff complains is caused by the acts of the persons having control of the canal, in allowing the same to fall into a lack of repair which did not formerly exist, and is not attributable to the acts of the defendant." The proffered evidence was excluded, subject to exception.

The plaintiff based his case upon evidence that he suffered no shortage until the first drouth after the defendant built its waterworks. This was in the fall of 1902. It then became competent for the defendant to show that the shortage at that time was caused by a want of repair in the structures between Bullet pond and the plaintiff's premises. This is manifestly a different proposition from the offer to show that better conservation facilities

would improve the plaintiff's water supply. The testimony that the structures were out of repair was not excluded. The offer of proof is said by those who tendered it to have been "made with extreme care," and is to be here treated as stating fully what the defendant expected to prove. The presiding justice understood that the offer was merely to show that conservation would have furnished sufficient water to operate the plaintiff's ram. The idea of the defendant seemed to be that the plaintiff's rights were limited to the amount of power he used. His right was to the whole power, less reasonable diminution by the upstream proprietors. There was no offer to show that conservation would have given the plaintiff his full right; and it is no answer for one who has interfered with it to say that if it had not been for other interference by third persons, the plaintiff would still have had as much of his right as he desired to use. Neither is it an answer to say that if the plaintiff took care of what the defendant left for him he would have no need for what the defendant had wrongfully taken. This is what the offer of proof amounted to. It was an offer to show that he would have "sufficient water to run his ram." The statement now relied upon, that "the defendant is entitled to show that the damage of which the plaintiff complains is caused by the acts of the persons having control of the canal, in allowing the same to fall into a lack of repair which did not formerly exist, and is not attributable to the acts of the defendant," was not made as an offer to prove these facts. It was stated as a reason why the facts which were offered ought to be received. The record shows that the defendant had been persistently urging the position that because the plaintiff, or those controlling the outlets at Grassy pond and Rugg meadow, did not take care of what water the defendant left in the stream, therefore the defendant was not accountable to the plaintiff for what it took. The offer of proof was the culmination of the discussion of this proposition, and was understood by the presiding justice to have the meaning above indicated. "The court did not exclude, but allowed the defendant to introduce, testimony tending to show that, because of the condition of the dams and canal as they have been since the fall of 1902, the water went to waste and was diverted, as tending to show that the depletion of the water complained of by the plaintiff was not the taking of the water by the town as aforesaid. The evidence excluded was simply evidence tending to show how the water of the canal might be conserved." The offer of proof was made in such a form that it was not unreasonable for the court to understand it as he did. If counsel had a different understanding, the burden was upon them to state it plainly. *Felch* v. *Weare*, 66 N. H. 582. If, as they now seem to claim, the

defendant's counsel understood the ruling to prevent them from introducing other evidence upon the facts as to the comparison between the past and present conditions of the structures at Grassy pond and Rugg meadow, their remedy is to apply to the superior court for a new trial upon the ground of accident or mistake. P. S., *c.* 230, *s.* 1. The exception is overruled.

*Case discharged.*

All concurred.