**UNITED STATES of America, Appellant in No. 73–1832,**

v.

**1,629.6 ACRES OF LAND, MORE OR LESS, IN the COUNTY OF SUSSEX, STATE OF DELAWARE, et al.**

**Appeal of Jennie H. J. LAYTON, in Nos. 73–1833/4.**

**Nos. 73–1832—73–1834.**

United States Court of Appeals, Third Circuit.

Argued May 29, 1974.

Decided Sept. 3, 1974.

As Amended Oct. 9, 1974.

Wallace H. Johnson, Washington, D. C., Ralph Keil, Wilmington, Del., Harry W. McKee, Raymond N. Zagone, Carl Strass, Washington, D. C., for appellant, United States.

James M. Tunnell, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Ralph J. Luttrell, Washington, D. C., for The Island Farm, Inc.

H. James Conaway, Jr., Young, Conaway, Stargatt & Taylor, Jack B. Jacobs, Doris M. Toll, Richard A. Levine, Wilmington, Del., for Jennie H. J. Layton.

Before ROSENN and HUNTER, Circuit Judges and HANNUM, District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This appeal arises out of a suit by the United States government to condemn 1,629.6 acres of land in Sussex County, Delaware. The defendants in the action were Island Farm, Inc. (Island Farm) and Jennie H. J. Layton (Layton). The government and Layton have appealed from the decision of the district court and Island Farm has responded with a motion that seeks dismissal of Layton's appeal or in the alternative a "summary affirmance."

Layton's appeal takes issue with the district court's determinations on the boundary and title disputes that arose, between herself and Island Farm, in the litigation. The district court's decisions on these issues generally favored Island Farm and had the effect of increasing its compensation award and reducing Layton's. The government's appeal is concerned primarily with what it contends are errors made in computing the

compensation that Island Farm is to receive for the taking of its land.[1]

Since the facts relevant to these issues are fully explained by the district court, United States v. 1,629.6 Acres of Land, 335 F.Supp. 255 (D.Del.1971), we will not repeat them here. Further, with the exception of a single issue, we are in full agreement with the district court's analysis and discussion of the questions raised on appeal. As a result, on all issues other than one dealt with below, we affirm on the basis of the district court's fine opinions. 335 F.Supp. 255 (D.Del.1971); 360 F.Supp. 147 (D.Del. 1973).[2]

Our only disagreement with the district court concerns its determination on the question of title to the barrier beach land in the area designated by the court as Segment II (hereinafter referred to as "Segment II beach land"). *See* 335 F.Supp. at 277. We feel that the district court erred when it concluded that this land belonged to Island Farm rather than to Layton.

■ Before discussing the merits of this issue, we must deal with a preliminary objection raised by appellant Layton—that is, that the district court lacked jurisdiction to decide this title question. This contention is based on the fact that the Segment II beach land is not a part of the land condemned, but instead is a piece of land severed from the property taken. As a result, resolution of the dispute over title to this land affects these proceedings only through the effect that it has on the severance damages to be awarded to each defendant. This relation to the proceedings is, according to Layton, insufficient to create jurisdiction.

■ We do not agree. The district court clearly has jurisdiction in a condemnation proceeding brought by the United States government to fix the amount of compensation awarded, and to apportion it among the claimants, 6 J. Moore, Federal Practice ¶ 71A.10 [1]. Moreover, this latter right necessarily includes the power to determine who among competing claimants owns the condemned land. *See* United States v. 22,680 Acres of Land, 438 F.2d 75 (5th Cir. 1971); United States v. Atomic Fuel Coal Co., 383 F.2d 1 (4th Cir. 1967); Tyson v. Iowa, 283 F.2d 802 (8th Cir. 1960); Clark v. White, 185 F. 2d 528 (5th Cir. 1950).

We believe that the court's jurisdiction to determine the amount of compensation and its allocation would be significantly hampered if we were to hold that the power to resolve title questions extends only to disputes involving title to the condemned land itself. First, such a ruling would make it impossible for the court to exercise its power to apportion the compensation among competing claimants, in any case involving a dispute as to the ownership of severed land, since it would be impossible to determine which party was entitled to the severance damages awarded. Second, since damages to the severed land are likely to vary from claimant to claimant, this ruling would also make it impossible, in many cases (including this one), to determine even the amount of compensation to be awarded.

■ Thus, as a practical matter, the jurisdiction of the district court should include the right to resolve title disputes involving severed, as well as condemned, lands so that it can handle all phases of condemnation cases effectively. Since such a holding is entirely compatible with the language of the statutes conferring jurisdiction in this area, 28 U.S.C.

---

1. The government also seeks to appeal from the district court's key title determination with regard to the barrier beach land. We seriously doubt the government's right to raise this issue on appeal, since it chose not to involve itself in the district court's proceedings on the question in any way. However, the same issue is raised by Layton, so that we reach it in any case.

2. The issues raised by Island Farm in its "Motion to Dismiss Defendant Layton's Notices of Appeal, or, in the alternative, for Summary Affirmance of the District Court's Title Determination" were not raised before the district court or discussed in its opinions. However, these contentions are clearly without merit and will be rejected without further discussion.

§§ 1345, 1358 (1970), we adopt this approach. Accord United States v. 11,-993.32 Acres of Land, 116 F.Supp. 671 (D.N.D.1953).[3]

With regard to the merits of the dispute over title to the Segment II beach land, we feel that the judgment in favor of Island Farm must be reversed. The district court took the position that Island Farm was vested with riparian rights and that as such it was entitled to accretions forming in front of its property. While we can assume *arguendo* that the court's discussion of the law as it applies to landowners with riparian rights is correct, we cannot accept its initial premise; that is, that Island Farm is vested with riparian rights.

As the district court itself noted the general rule is that "riparian rights attach to land adjacent to natural watercourses, *but do not attach to land adjoining an artificial channel.*" 335 F. Supp. at 271 (emphasis added). Since the Broadkill Inlet was formed by artificial means, this would seem to prevent riparian rights from attaching to the lands owned by Island Farm. However, the district court went on to point out that there are exceptions to this general rule, and it concluded that two of these exceptions were applicable here.

The first exception that the court applied is based on the theory of prescriptive rights. Several authorities are cited for the proposition that riparian rights can be obtained on artificial waterways by prescription.[4] However, even if we assume that the district court has cited to a correct rule of law, it can have no application here since prescriptive rights cannot be obtained against the federal government.[5] This is fatal to Island Farm's claim since the government owned the land upon which the Broadkill Inlet was constructed until 1957, three years *after* the inlet had completely filled in to reform an unbroken barrier beach.[6] Thus, throughout the period that Island Farm adjoined the artificial waterway, that waterway was owned by the government so that no riparian rights could attach by prescription.[7]

The second exception to the general rule barring riparian rights in artificial channels that was relied upon by the district court can be summarized as follows: under certain circumstances artificial waterways will be treated as though they are natural.[8] Once again, the court has cited to what we can assume is a valid rule of law, but has applied it in a case where the facts bar its application.

---

3. Layton also argues, in the alternative, that the district court should have abstained from deciding the title issue. Even if we assume that state law is to be applied in resolving the title dispute presented here, see note 10 *infra*, we cannot accept this contention. As we have noted in the text federal courts make title decisions as a matter of course where the land in dispute is actually taken in the condemnation proceedings. *See* United States v. 22,680 Acres of Land, *supra*; United States v. Atomic Fuel Coal Co., *supra*; Tyson v. Iowa, *supra*; Clark v. White, *supra*. If abstention is inappropriate in these cases, it is equally inappropriate in cases like the present one where the court must determine title to land outside the condemned area in order to complete the proceedings. The court in each instance is required to interpret the same body of state law and the issues involved are not made different or more uncertain simply because the property in dispute is not condemned. The mere physical location of the land cannot make abstention more or less appropriate.

4. 335 F.Supp. 271 n. 74.

5. *See* Annot., 55 A.L.R.2d 554, 563, 576 (1957); 25 Am.Jur.2d Easements & Licenses § 41 (1966).

6. Opinion of the district court, 335 F.Supp. at 261. This finding is not clearly erroneous.

7. Island Farm's claim to prescriptive riparian rights appears to suffer from a second defect, as well, since adverse use of these rights does not appear to have been established. 93 C.J.S. Waters § 129d (1956).

8. The rule is more fully explained by the district court, 335 F.Supp. at 272.

While the cases we have found that rely on this rule are somewhat vague in defining its requirements, the vast majority do share at least one common characteristic—they have applied the rule only in situations where the party invoking it has relied upon use of the artificial waterway that is deemed "natural" for legal purposes.[9] Since no such reliance by Island Farm has been suggested here, we feel that this exception cannot be applied.[10]

Thus, the Broadkill Inlet is to be treated like any other artificial waterway and riparian rights cannot attach to lands adjacent to it.[11] As a result, Island Farm cannot obtain title to the Segment II beach land through the operation of the rules that govern the allocation of title to accretions forming in front of lands that are vested with riparian rights since no such rights ever vested in Island Farm.[12]

The judgment of the district court will be reversed and the cause remanded for a determination of the Island Farm-Layton boundary in the area designated as "Segment II" and for all other adjustments in the judgment of the district court made necessary by our decision.

Each party will bear its own costs.

9. Clement v. State Reclamation Board, 220 P.2d 897, 35 Cal.2d 628 (1950); Natural Soda Prod. Co. v. Los Angeles, 23 Cal.2d 193, 143 P.2d 12 (Cal.1943); Delaney v. Boston, 2 Del. (Harr.) 489 (1839); Stimson v. Brookline, 197 Mass. 568, 83 N.E. 893 (1908); Kray v. Muggli, 84 Minn. 90, 86 N.W. 882 (1901); Taggart v. City of Jaffrey, 75 N.H. 473, 76 A. 123 (1910); Earl v. DeHart, 12 N.J.Eq. 280 (1856); Townsend v. McDonald, 12 N.Y. 381 (1855); Cloyes v. Middlebury Elec. Co., 80 Vt. 109, 66 A. 1039 (1907); Murchie v. Gates, 78 Me. 300, 4 A. 698 (1886). Kansas is the only jurisdiction we have been able to find in which the rule appears to be applicable in cases where there is no apparent reliance upon the artificial waterway by the party invoking it. Hornor v. City of Baxter Springs, 116 Kan. 288, 226 P. 779 (1924); Mo. Pac. R.R. Co. v. Keys, 55 Kan. 205, 40 P. 275 (1895). However, even these cases can be distinguished from the present case since they involve the diversion of natural streams into artificial channels, rather than the creation of wholly new waterways.

10. Naturally, other factors in addition to "reliance" may be prerequisite to the application of this rule. However, since this necessary requirement is absent in this case, there is no need to explore other requirements that may exist.

11. We note that the appellants disagree over whether this title dispute is governed by state or federal law. The government's brief, at page 8 n.4, asserts that federal law controls since Layton claims under a quitclaim deed from the government. Layton, on the other hand, by arguing that the federal courts should abstain from deciding the question implicitly suggests that state law controls. Since Delaware law coincides with our view of the proper federal rule in this area, we make no attempt to resolve this question. Delaney v. Boston, supra, 2 Del. (Harr.) 489 (1839).

12. We note that the concurring opinion reaches the result that we do, but that they chose to rest their decision, in part, on other grounds. While we take no position on the validity of their thoughtful discussion, we decline to adopt their approach because we feel that a decision on the two additional issues they discuss is not necessary in order to resolve the dispute before us.

The concurring opinion makes three points: 1) that title to accretions can never vest in adjoining landowners when the waterway involved was created by dredging operations; 2) that title to accretions cannot vest in land originally owned by the government in any case; and 3) that in the absence of a showing that Island Farm has used its riparian rights, it cannot obtain title to accretions in land originally owned by a private party—that is, by Layton.

We note that the concurring Judge's third point substantially repeats the last point that we made in the text of our opinion: absent reliance, title to the accretions cannot vest in Island Farm under the facts of this case. It is true, that the concurring Judge only applies this rule as against land originally owned by the private party, Layton. However, if the rule is applicable with regard to "Layton's land" we believe that it is, a fortiori, applicable with regard to the land originally owned by the government. Thus, we believe that a single holding suffices to dispose of the entire issue.

Judge HANNUM concurs in this opinion and in Judge ROSENN's concurrence as well.

ROSENN, Circuit Judge, with whom HANNUM, District Judge, joins (concurring).

I agree with the majority that for purposes of this case [1] Island Farm does not have title to the Segment II beach land. I reach this result, however, by a somewhat different route than does the majority. In order to make my position on this issue clear, I must summarize the facts of the case which are comprehensively set forth in the district court's first opinion. 335 F.Supp. at 255. On all other issues I agree with the majority and with the district court.

Prior to 1907 the pertinent land area consisted of two parcels on either side of the Deep Hole Creek, which ran north and south.[2] To the west of the Creek was the Delaware mainland, which near the Creek consisted of marsh and fast land. To the east of the Creek was a strip of barrier beach land with its eastern side fronting on the Delaware Bay. These two parcels will be referred to as the *western parcel* and the *eastern parcel*, respectively, throughout this opinion. Both parcels were owned by Hall in 1907.

North of the pertinent area, the Creek turned eastward and connected with the Delaware Bay. South of the pertinent area, the Creek connected with the Broadkill River. The Creek which was a navigable waterway, was the sole means of access between the Delaware Bay and the Broadkill River. A simple sketch of the pertinent land configuration is attached hereto as Appendix A.

The junction of the Creek and the Delaware Bay, however, was for various reasons "unacceptable as a permanent channel for navigation."[3] The Federal Government determined to stabilize navigation between the Bay and the Broadkill River by building a new waterway connecting the Creek and the Bay. In 1907 it purchased 5.8 acres of the eastern parcel owned by Hall, dividing Hall's remaining eastern parcel into two disconnected segments. The Government built a jetty across this newly purchased land, and dredged its land south of the jetty so as to connect the waters of the Creek and the Bay. The new body of water created from the dredging of the Government land was called the Broadkill Inlet. The result was a continuous navigable route from the Delaware Bay, through the Broadkill Inlet, south a short distance along the Deep Hole Creek, and thence into the Broadkill River. A sketch of the land configuration at the time is attached hereto as Appendix B.

In 1921, after a portion of the southern segment of Hall's remaining eastern parcel had eroded,[4] Hall sold his entire remaining interest in the eastern parcel to Layton. The deed purported to convey the entire original eastern parcel except for the 5.8 acres previously sold to the Government.

In 1936, after further erosion had taken place, Hall sold the entire western parcel to Draper, who shortly thereafter transferred title to Island Farm, a family corporation. The Hall deed purported

---

1. The district court expressly limited the effect of its title determination to this case, stating that the decision could not be pleaded as res judicata or collateral estoppel in a state court title proceeding. *See* 335 F.Supp. at 259 n.8.

2. I follow the district court and adjust all directions as if the Creek ran north and south, even though it actually ran northwest and southeast. *See* 335 F.Supp. at 260 n. 15.

3. 335 F.Supp. at 260 n.6.

4. The district court found that during the 1907–1953 period, the Inlet "wrought substantial and frequent changes in not only the Deep Hole Creek, the Broadkill River, barrier beach land, and mainland in the immediate area of the jetty, but also the shore bordering the Delaware Bay south of the inlet." 335 F.Supp. at 272. The court concluded that the Inlet had the attributes of, and must be treated as, a natural waterway. *Id.*

to convey all of Hall's land west of the Deep Hole Creek. It should be noted, however, that by this time the Inlet had widened, increasing that portion of the western parcel which bordered on the Inlet and which was therefore directly connected to the Delaware Bay. The topography of the relevant area at this period in time is given in Appendix I of the district court opinion. *See* 335 F. Supp. at 276.

Shortly after 1936, a second inlet was built at a different location. The Broadkill Inlet was thereafter used less frequently and eventually began to shoal up. In 1953, the Government stopped maintaining the Broadkill Inlet, and by 1954 the Inlet had completely filled in with alluvium. The alluvium extended to the edge of the western parcel, blocking the flow of the Creek in this area. The result was a single solid land unit in 1954, not transversed by water. See Appendix II of the district court opinion, 335 F.Supp. at 277.[5]

In 1957, the Government conveyed to Layton, by quitclaim deed, land described therein as consisting of "the same premises conveyed to the United States of America by Deed of George H. Hall and Della H. Hall, his wife, dated July 5, 1907 . . . ." The dispute in this case concerns ownership of Segment II, the dry land which is now located on the site of what had formerly been the Broadkill Inlet. Layton, supported by the Government, contends that the chain of title to the 5.8 acres ran from Hall to the Government in 1907, and from the Government to Layton in 1957. Layton claims ownership of all the land corresponding to the eastern parcel owned by Hall until 1907, i.e., all of the land in the relevant area fronting on the Delaware Bay.

The district court rejected this contention, granting Island Farm title to the area that had been the Broadkill Inlet at the time Draper purchased its land in 1936. The court reasoned that "in the Broadkill Inlet area, *the Government could and did lose title to any land* eroded away by the actions of the inlet, or *dredged to establish the navigable channel.*" 335 F.Supp. at 273 (emphasis supplied). The court then held that the accretion which resulted in the filling in of the Inlet area should be awarded to Island Farm rather than to Layton, in order to preserve the riparian interests of Island Farm as they existed when Draper purchased the land.[6] Layton was left with two disconnected segments of land fronting on the Delaware Bay, corresponding to her ownership in 1936.

■ I would reverse the district court on this aspect of its opinion because I believe the Government never lost title to the 5.8 acres from the time it purchased the dry land in 1907 until it sold the dry land to Layton in 1957. Layton purchased a fee interest in the land in 1957, and Island Farm has no legal interest therein.

The district court relied in part on the principle that the Government, just as any private party, is subject to the loss of land by erosion and the gain of land by accretion.[7] The court apparently analogized dredging to erosion, and concluded that the Government lost title to the 5.8 acres when it dredged the land to create the navigable inlet.

I do not believe, however, that the rationale of the erosion and accretion principle extends to dredging. The principle is based in part upon the "compensation theory" that "[s]ince a riparian owner is subject to losing land by erosion be-

---

5. The narrow body of water running left and right in this diagram is an artificial channel dredged by Layton in 1968, and does not have any relevance for present purposes.

6. The court applied the rule that "a riparian landowner cannot be made non-riparian by accretion and therefore, regardless of the

manner in which an alluvian accretes or to whom it initially attaches, the riparian owner in front of whose land it forms gets title to it." 335 F.Supp. at 268.

7. See references cited in the district court opinion at 335 F.Supp. at 273 n.82.

yond his control, he should benefit from any addition to his lands by accretions thereto which are equally beyond his control." Bonelli Cattle Co. v. Arizona, 414 U.S. 313, 326, 94 S.Ct. 517, 526, 38 L.Ed.2d 526 (1973). Since there is no analogue to voluntary dredging by which an owner could *gain* title to land, I do not believe that dredging should result in the *loss* of title to land. *See* United States v. Turner, 175 F.2d 644, 648 (5th Cir.), cert. denied, 338 U.S. 851, 70 S.Ct. 92, 94 L.Ed. 521 (1949), stating that artificial dredging of privately owned land would not deprive the owner of title to the land which he put below water by this means.[8]

These considerations are especially strong where the Government deliberately dredges its land in order to further navigation. An intolerable burden would be imposed on the Government's plenary power over navigable waters of the United States, and its duty to further navigation, if we were to hold that the Government may dredge its own land for that purpose only at the cost of permanently losing title to the land by that act.

■ Although the district court's conclusion is phrased in terms of the Government's losing title by dredging, the point the district court ultimately makes is that the Government lost title to the 5.8 acres when it permitted the land to fill in. The reasoning is that when Draper purchased land fronting on the Government-maintained Inlet in 1936, he and Island Farm (his nominal successor in interest) became vested with a permanent right of access to the Delaware Bay, even if the only way to maintain that access is to give Island Farm title to the alluvium now located on the former location of the Inlet. I disagree with this conclusion, and, unlike the majority in this case, I do not rely upon the failure of Island Farm to use its riparian rights before the Inlet filled in.

To begin with, since the Government did not lose title to the bed of the Inlet after dredging, it retained title after it permitted the land to fill in. Burns v. Forbes, 412 F.2d 995, 997–998 (3d Cir. 1969). Even assuming *arguendo,* however, that this rule cannot be used to defeat a party's riparian interests, and also assuming *arguendo* that the Island Farm land could be deemed riparian to the Delaware Bay in 1936 because the Broadkill Inlet took on the characteristics of a "natural watercourse," I still conclude that the Government did not lose title to the 5.8 acres until it sold the land to Layton. I believe that the Government had a clear right to eliminate any riparian interests of the Island Farm land by restoring the land it had dredged or by permitting the Broadkill Inlet to fill in, without Island Farm thereby obtaining any rights as against the Government.

I find closely on point the case of United States v. Commodore Park, Inc., 324 U.S. 386, 65 S.Ct 803, 89 L.Ed. 1017 (1945). In that case, the Government had deposited material into a navigable creek, destroying the navigability of the creek and thereby eliminating the riparian right of access to navigable waters formerly enjoyed by property contiguous to the creek. The Supreme Court rejected the property owners' claim that the Government's action in blocking the creek was a taking of property requiring compensation under the Fifth Amendment. The Court stated:

> *Second.* Nor does a riparian owner acquire a unique private right distinct from that held by all others, to have access to and enjoyment of navigable waters and to recover compensation from the government because deprived of that privilege by an authorized governmental change in a stream. Respondent's property was always subject to a dominant servitude; it did not have a vested right to have this navigable stream remain fixed and

---

8. All three judges on the *Turner* panel concurred in this point. See the first paragraph of Judge Sibley's concurring opinion.

unaltered simply because of the consequent reflected additional market value to adjacent lands. Whatever market value of riparian lands may be attributable to their closeness to navigable waters, does not detract from the government's "absolute" power, in the interests of commerce, to make necessary changes in a stream. In short, as against the demands of commerce, an owner of land adjacent to navigable waters, whose fast lands are left uninvaded, has no private riparian rights of access to the waters to do such things as "fishing and boating and the like," for which rights the government must pay. Riparian rights of access to navigable waters cannot, as against the government's power to control commerce, be bought and sold.

324 U.S. at 390–391, 65 S.Ct. at 805–806 (footnotes omitted).

In the instant case, therefore, the Government had no duty to pay money compensation to Island Farm for destroying Island Farm's right of access to the Delaware Bay when, in furtherance of navigation, it abandoned the Broadkill Inlet in favor of another inlet without invading the fast land of Island Farm. *Commodore Park, supra,* also makes clear that Island Farm enjoyed no vested riparian rights as against the Government by virtue of its location at the foot of the Government inlet. Island Farm's claim of title in the instant case would be analogous to a claim that the landowners in *Commodore Park* bordering on the creek obtained title to the area of the creek filled in by the Government. In light of the Supreme Court's language quoted above, this contention would clearly have been rejected as without merit. I do not believe, therefore, that the Government must compensate Island Farm in *any* form, either in money or in title to the land on the former location of the Broadkill Inlet.[9] I conclude that the Government

never involuntarily lost title to the 5.8 acres, and that Layton acquired title to that land by purchase in 1957.

My discussion thus far has concerned title to the 5.8 acres which the Government purchased in 1907 and sold in 1957. The district court found, however, that by 1936 the Broadkill Inlet had widened by eroding Layton's land outside of the 5.8 acre parcel. The district court, in awarding Island Farm title to land based upon its frontage on the Inlet as of 1936, therefore awarded some land to Island Farm which was outside the 5.8 acres in question, and which had previously been owned by Layton before being eroded by the Inlet.

There is no contention that the Government ever had title to any land outside the 5.8 acres. The question of title to the remaining land awarded to Island Farm, therefore, is a purely private dispute between Island Farm and Layton. It could be persuasively argued that Island Farm should be awarded this land, preserving its riparian rights without infringing upon the Government's interests in navigation.

I agree with the majority, however, that Layton is also entitled to ownership of these land areas outside the 5.8 acres. In this situation the doctrine of riparian rights competes with the doctrine of reemergence, which restores title to the former owner of surfaced land when identifiable riparian land erodes and subsequently reemerges. *See Bonelli Cattle Co., supra,* 414 U.S. at 330 n. 27, 94 S.Ct. 517. At least absent a showing that Island Farm had used its riparian rights of access to the Bay, I believe that Island Farm's interest in now being made riparian to the Bay is subordinate to Layton's interest in regaining land which had formerly eroded and has now reemerged. Therefore, as does the majority in this case, I would award Layton all of the land in the Segment II area.

9. *See also* Gibson v. United States, 166 U.S. 269, 17 S.Ct. 578, 41 L.Ed. 996 (1897); South Carolina v. Georgia, 93 U.S. 4, 23 L. Ed. 782 (1876); United States v. Rands, 389 U.S. 121, 122–123, 88 S.Ct. 265, 19 L. Ed.2d 329 (1967).

## APPENDIX A:

### Configuration of Land Prior to
### 1907

## APPENDIX B:

### Configuration of Land Following
### Dredging of Broadkill Inlet
### in 1907