FREDERIC J. STIMSON vs. INHABITANTS OF BROOKLINE.

Norfolk.     January 10, 1908. — February 28, 1908.

Present: KNOWLTON, C. J., HAMMOND, LORING, & SHELDON, JJ.

*Watercourse.*

If an ancient ditch or waterway, connecting two parts of a winding river, was constructed in 1652 or 1653 in pursuance of a vote of a town, and then ran in a part or all of its course through common land, and if when the ditch was cut the water of the river flowed through it without artificial aid and thereafter there was water in it a part or all of the time in every year, until it was dammed, it having at times a large flow, the stream running through such ditch can be found to have acquired the character of a natural watercourse, so that one who owns land on the river below the upper opening of the ditch, whose land is flooded, because of the damming of the outlet through the ditch, has a remedy in tort against the constructor of the dam.

If the land of a riparian owner is injured by the obstruction of a stream which he has a right to have kept open as a watercourse, his remedy by an action of tort against the obstructor is not taken away or diminished by showing that the land of all the other riparian proprietors in a like position on the river suffered similar damage from the same cause.

A riparian owner who alleges that his land has been injured by the obstruction of a stream which he has a right to have kept open as a watercourse, in order to maintain an action of tort for the alleged injury, need not show actual damage in his present use of the land. It is enough if it appears that an injurious effect is produced upon his property by the maintenance of the obstruction such as to diminish its value if the obstructor by lapse of time should acquire a right to maintain the obstruction.

TORT for damages alleged to have been sustained by the plaintiff to his land situated on the bank of the Charles River, through the damming by the defendant of Long Ditch in Dedham, by reason of which the plaintiff alleged that the quantity of water in the Charles River was increased at the upper end of the ditch, and that the water was made higher on the land of the plaintiff, thus causing his land, about two miles below the entrance to Long Ditch as the river runs, to become marshy and unfit for raising hay or pasturing cattle, and also partially destroying a roadway on the plaintiff's land.     Writ dated November 4, 1901.

At the trial in the Superior Court before *Hardy,* J., the jury returned a verdict for the defendant; and the plaintiff alleged exceptions.     The evidence is described in the opinion, where

also the plaintiff's requests for rulings and the portion of the judge's charge relating to them are described.

*H. Livermore,* for the plaintiff.

*W. D. Turner & S. S. Fitzgerald,* for the defendant.

KNOWLTON, C. J.   The evidence in this case tends to show that, at a place in Dedham called the Broad Meadows, there is a channel or depression along the surface of the ground, which is known as Long Ditch, in which there is more or less water. This ditch connects with the Charles River at each end.   The river takes a very circuitous course, such that the distance between the ends of the ditch, measured by the curve and windings of the river, is six or eight miles, while the length of the ditch through the meadows is only about three quarters of a mile.   The plaintiff is a riparian proprietor on the river, about two miles down the stream from the upper end of the ditch. The defendant owns land through which the ditch runs in the upper part of its course, and it has built a dam there which the plaintiff contends sets back water so as to increase the flow in the river below, to the damage of his real estate.   It was undisputed that the ditch is ancient, and there was evidence tending to show that it was " cut across the Broad Meadows from river to river " in 1652 or 1653.   There was evidence on the part of the plaintiff that at times it has a large flow, and he contended that it was a watercourse which, so long as it was unobstructed, carried a substantial part of the water of the Charles River. The defendant introduced evidence tending to show that it had become more or less obstructed by the growth of vegetation, trees and bushes, and by the construction of a road across the lower end of it, and by other natural or artificial causes, and that for more than twenty years it had ceased to be a natural watercourse, if it ever had been one, which the defendant denied. The defendant also contended, and introduced evidence tending to show, that the erection of the dam had no effect upon the amount of water which could pass through the ditch, because it was lower than the road above mentioned, and because of the other obstructions, and that it had no effect upon the height of the water on the plaintiff's land.

A fundamental question was whether Long Ditch was a watercourse, the water in which all persons who might be affected by

it were entitled to have flow without obstruction, as if it were a natural watercourse, or whether it was a mere drain, dug to carry off surface water and water percolating through the ground.

The evidence tended to show that, while very ancient, it was of artificial construction. A record of a town meeting of the town of Dedham, held in the year 1652, refers to it as a watercourse to be cut through the Broad Meadow, and indicates that, in a part or all of its course, it ran through common land. The jury might infer from the evidence that it was cut through at about that time from the river at its upper terminus to the river at its lower terminus, that water flowed through it, and that there has been water in it a part or all of the time in every year since. On the other hand, they might find that years ago it ceased to be a watercourse, if it was one formerly.

The plaintiff made numerous requests for rulings relating to the law applicable to watercourses, one of which was that, " on the evidence the jury should find that Long Ditch is an ancient watercourse." Another was: " The law is the same if the ditch was dug in 1652, or more than fifty years before the suit, as if it were originally a natural watercourse."

Most, if not all of these, could not be given in the form requested, some of them because they assumed the existence of facts which were for the jury to find, and some because, while generally correct, they involved some alternative element of law which was not accurately stated. But they plainly directed the attention of the judge to the proposition that the mere fact that a watercourse was artificially dug would not necessarily prevent the existence of rights in it, after a long time, like those pertaining to a natural watercourse. Exception was taken to the instructions given, so far as they were not in accordance with the plaintiff's requests.

The judge submitted to the jury the question whether this was a natural watercourse or an artificial watercourse, and said to them: " If you find that it was not a natural watercourse, then your verdict should be for the defendant." There are portions of the charge which leave us in doubt as to the precise distinction that he intended to make between a natural watercourse and an artificial watercourse. From some of his illustra-

tions one might infer that he meant by an artificial watercourse a drain to carry off surface water, and that he intended to include among natural watercourses watercourses artificially constructed, which were so maintained and used for many years that they ought to be treated by the courts as if they were natural watercourses. But he did not say this, nor anything like it. He said of a ditch dug for drainage, "that is not a natural watercourse; that is something made by man." In another part of the charge he said: "A course that is established by the hand of man by digging a ditch is not to be considered a natural watercourse." We think the jury understood him to mean that, if this was a flow of water, however large or continuous, which had its origin long ago in the artificial opening of a ditch to receive a part of the flow of the Charles River, especially in times of high water, it was not a natural watercourse, but was an artificial watercourse, and the plaintiff could not recover. If he meant that the term "natural watercourse" does not include any watercourse which was originally created by the directing hand of man, to determine the flow of the water by works of construction, his instruction that unless this was a natural watercourse the plaintiff could not recover was erroneous.

In *Freeman* v. *Weeks*, 45 Mich. 335, Judge Cooley said: "If by common consent the ditch was dug as a neighborhood drain and has remained open as a watercourse for a series of years, it ought to be governed by the same rules that apply to other watercourses." It has often been decided both in England and America, that watercourses made by the hand of man may have been created under such conditions that, so far as the rules of law and the rights of the public or of individuals are concerned, they are to be treated as if they were of natural origin. Baron Channell said of one of them, in *Nuttall* v. *Bracewell*, L. R. 2 Ex. 1, "It is a natural stream or flow of water, though flowing in an artificial channel." Other cases recognizing the doctrine are the following: *Magor* v. *Chadwick*, 11 A. & E. 571. *Holker* v. *Poritt*, L. R. 8 Ex. 107. *Sutclife* v. *Booth*, 32 L. J. Q. B. 136. *Reading* v. *Althouse*, 93 Penn. St. 400. *Weatherby* v. *Meiklejohn*, 56 Wis. 73. The principle is analogous to that under which other rights are acquired in real property by prescription or adverse use. If the public au-

thorities, representing the sovereign power, by a formal legislative act in 1652, took a part of the water of the Charles River and conducted it three quarters of a mile through a new channel, and thereby made a new watercourse, satisfying by compensation or otherwise all private rights of property affected by the change, if there were any, there would be good ground for contending that thereby a watercourse was established, which should be treated at once by the courts like a natural watercourse. Certainly after a long lapse of time, and even after no more than twenty years, if this watercourse continued without change, with the acquiescence of the public authorities and of everybody interested, there is every reason, both upon principle and authority, for applying the same rules of law to it as to a natural watercourse. In the early years of the colony the towns, for many purposes, were representatives of the sovereign power as to the management and disposition of common lands and public rights in land within their boundaries. *Attorney General* v. *Herrick,* 190 Mass. 307, 310, 312, and cases cited. It is conceivable that the mere construction of a watercourse and dedication of property to that use by all the persons whose rights of property might be affected by the change, with acceptance by the public, if public interests were involved, might give these persons the same rights in it that they would have if it were a natural watercourse. It is unnecessary to determine for every conceivable case under what conditions such rights might be created. We think in the present case, that if the flow of water through Long Ditch for many years was such as would constitute it a natural watercourse carrying a part of the water of the Charles River if the flow had begun without artificial aid, the jury might find that it was a watercourse to which the same rules of law apply as are applicable to natural watercourses.

As there was evidence tending to show that an important reason for digging the ditch was drainage of the meadows, and as there was other evidence relied on by the defendants, it was a question of fact for the jury whether it was ever in any proper sense a watercourse of any kind, or anything more than a ditch for carrying off surface water and draining the land through which it passed.

If this should be treated as a watercourse, the judge rightly

ruled that the defendant would be liable if it maintained a dam which held back the water that otherwise would have flowed through the ditch, and thus sent down the Charles River an increased quantity of water, to the injury of the riparian proprietors below. But he was wrong in telling them that, if this was a nuisance affecting all the riparian proprietors on the stream below, not affecting one person more than another, this is not the proper remedy. By an illustration he suggested that the remedy in such a case would be by indictment, and added: "If this dam did not affect the particular plaintiff more than any other owner on the stream below the locus of the dam, then perhaps this defendant might be called into some other court to answer, rather than in this in an action of tort." The plaintiff's request on this subject was as follows: "The plaintiff can recover if he proves any special damage to his land, although similar damage may have been sustained by some other riparian proprietors." This instruction should have been given. The rule is that if every riparian owner suffers damage in his property precisely like that of every other riparian owner, he may have his remedy in an action of tort. *Lawrence* v. *Fairhaven*, 5 Gray, 110, 114. *Wesson* v. *Washburn Iron Co.* 13 Allen, 95, 101. *Blackwell* v. *Old Colony Railroad*, 122 Mass. 1. The plaintiff asked the judge to instruct the jury that "the fact that other obstructions had grown or been placed in Long Ditch, will not preclude the plaintiff from recovery if the dam erected by the defendant contributed or tended to impede the free flow of water through the ditch." The proposition of law intended to be embodied in the request is correct. *Wheeler* v. *Worcester*, 10 Allen, 591, 601. *Jackman* v. *Arlington Mills*, 137 Mass. 277. *Sherman* v. *Fall River Iron Works*, 5 Allen, 213. *Monmouth* v. *Gardiner*, 35 Maine, 247. But there was no error in refusing the instruction, for the mere fact that the dam tended to impede the flow of water through the ditch, would not necessarily show that it would so far affect the flow of the Charles River as to cause any injury to the plaintiff's property.

It is true, as the plaintiff contends, that to maintain an action he is not obliged to show in his use of the land actual present damages. It is enough if it appears that an injurious effect is produced upon his property by the maintenance of the dam, such

as to diminish its value, if the defendant, by lapse of time, should acquire a right to maintain the dam. *Newhall* v. *Ireson*, 8 Cush. 595. *White* v. *Chapin*, 12 Allen, 516, 520. *Peck* v. *Clark*, 142 Mass. 436. *Parker* v. *American Woolen Co.* 195 Mass. 591, 602.

*Exceptions sustained.*