ARTHUR ULLIAN *vs.* JAMES A. CULLEN & another.[1]

Middlesex.    February 13, 1975. — April 3, 1975.

Present: HALE, C.J., ROSE, & KEVILLE, JJ.

*Watercourse.    Drain.    Equity Pleadings and Practice,* Rehearing.

In a suit in equity by the owner of certain property to restrain the owners of adjoining land from obstructing a watercourse, a master's report which contained no subsidiary findings as to the source of the waterflow other than drainage of surface water from the plaintiff's land nor as to whether the "existing flow of water" which a culvert on the defendants' property was designed to carry was an existing flow in a natural channel, was insufficient to support a finding that the drainage system was a natural watercourse. [162-164]

In a suit in equity by an owner of certain property to restrain the owners of adjoining land from obstructing a watercourse, this court declined to determine whether the plaintiff had a prescriptive easement to drain water from its land onto the defendants' land where neither the parties nor the master hearing the case had considered the question. [164-165]

BILL IN EQUITY filed in the Superior Court on September 29, 1972.

---

[1] Helen M. Cullen.

The suit was heard on a master's report by *Leen, J.,* and
a final decree was entered by *Good, J.*

*Margaret C. Mahoney* for the defendants.

*George M. Ford* for the plaintiff.

HALE, C. J.   This is a bill in equity to restrain the
defendants from obstructing a watercourse which carries
the flow of "surface water" from land owned by the trustees
of the Parkview Electronics Trust[2] and from higher land
across the trustees' and the defendants' lands to the Aber-
jona River. The plaintiff also seeks an assessment of dam-
ages. The case was referred to a master to "find the sub-
sidiary facts on each issue tried and report them and his
general findings based on such subsidiary findings to the
court." Rule 86 of the Superior Court (as amended effec-
tive June 1, 1970). The defendants filed objections to the
master's report (which are treated as exceptions) and
moved to discharge the reference to the master and to set
aside his report. Upon the denial of that motion, the defend-
ants moved to have the report recommitted. That motion
was also denied, and an interlocutory decree was entered
overruling the defendants' exceptions and confirming the
master's report. The trial judge then entered a final decree
ordering the defendants to unblock and reconstruct the
alleged watercourse and to grant the trustees an easement
to maintain the watercourse as reconstructed. The defend-
ants appeal from the denial of both motions and from the
interlocutory and final decrees.

We summarize the material facts found by the master.
The trustees' property adjoins the northerly side of the
defendants' property. South of the defendants' property is
the Aberjona River, toward which slope all of the trustees'
and defendants' property and the nearby land. Running
approximately along the boundary between the trustees'
and defendants' properties, but entirely on the defendants'
property, is an abandoned railroad spur track, the roadbed

---

[2] The plaintiff is the managing agent of this property. No question
has been raised as to his standing to bring the suit.

of which is appreciably higher than the surrounding land.

"[T]he water drainage system of the ... [trustees'] property carries its water in a southerly direction to ... [a] cul de sac at the entrance of" a concrete or stone culvert or pipe which leads under the spur railroad track to a formerly "swampy area" on the defendants' property apparently extending to the Aberjona River. Metropolitan Sewerage Commission plans of 1893 and 1914 "indicate a culvert construction under the ... spur track at the locus of" the present culvert. "[T]here was evidence" that in 1959 the culvert protruded from the southerly side of the roadbed and was called to the attention of one of the defendants; however, a prior owner of the trustees' property apparently discovered the existence of the culvert in late 1959 only after he looked at an old plan indicating its existence and "unearthed" its northerly opening. Although the master reported that there was no evidence that anyone had ever seen any water flowing from the southerly end of the culvert, he did find that around 1960 water was observed "seeping" into its northerly end. The master also found that "water has been seen on a number of occasions at the culvert entrance on one day and then less water at this same entrance or mouth the next day."

On December 31, 1959, the defendants leased their property for a period of one year to the town of Winchester (town) for use as a dump. The town's dumping and landfill operations caused the level of the defendants' property to be raised. When the town's bulldozer operator showed the culvert opening to one of the defendants, that defendant told him to bury the culvert opening.[3] Following the blockage of the culvert, water, backing up from the "area

---

[3] The Metropolitan Sewerage Commission plans dating back to 1893 and 1914 "show sewer lines all located to control and channel in a southerly direction down the ... [trustees'] property to and under the ... roadbed under and across the ... [defendants'] property to the river." These sewer lines were apparently not obstructed by the town's landfill operations as the master found that at least three manholes located on the defendants' property were raised higher as the property was filled in.

near the culvert," flooded parts of the trustees' property in 1962, 1967, and 1968. (There was also a finding by the master that water from the trustees' property flooded the defendants' property in 1963 and 1965.)

The master's general findings included findings (1) "that a well defined water course exists on the ... [trustees'] property," (2) "that the 1893 and 1914 plans indicate that ... [in the construction of the culvert] pains were taken for purposes of continuing an existing flow of water in its southerly direction to the river," and "indicate a south westerly water course from the ... [defendants'] end of the now buried culvert in a definite direction to the area of the ... Aberjona River," (3) "if such course existed that a significant portion was covered by the landfill operation conducted on ... [the defendants'] premises," and (4) that there was no evidence from which to determine the trustees' monetary damages.

1. If the trustees' "water drainage system" was part of a natural watercourse which continued across the defendants' property to the Aberjona River, the defendants can be ordered to unblock that portion of the watercourse which has been covered up. See *McGowen* v. *Carr*, 272 Mass. 573, 576 (1930); *Fitzgerald* v. *Fortier*, 292 Mass. 268, 272, 274 (1935); *DiNardo* v. *Dovidio*, 312 Mass. 398, 402 (1942); *Kuklinska* v. *Maplewood Homes, Inc.* 336 Mass. 489, 494 (1957); *Lincoln Park Amusement Co.* v. *Westport*, 339 Mass. 334, 336 (1959); *Myhr* v. *Vlahakis*, 348 Mass. 795 (1965). However, the findings of the master leave us in doubt whether the trustees' "drainage system" was part of a natural watercourse. To prove the existence of a watercourse "it must be made to appear that the water usually flows in a certain direction, and by a regular channel, with banks or sides. It need not be shown to flow continually; it may be dry at times, but it must have a well defined and substantial existence." *Ashley* v. *Wolcott*, 11 Cush. 192, 195 (1853). See also *Yaskill* v. *Thibault*, 273 Mass. 266, 268 (1930); *Fitzgerald* v. *Fortier*, 292 Mass. 268, 271, 274 (1935); *Kuklinska* v. *Maplewood Homes, Inc.* 336 Mass. 489, 493 (1957). The master's findings on the issue whether

there was a sufficiently constant flow of water to constitute a watercourse appear to be more in the nature of a recital of contradictory evidence than findings of fact. See *Davis v. Noone,* 341 Mass. 488, 490-491 (1960); *Flynn v. Korsack,* 343 Mass. 15, 16-17 (1961); *Lyons v. Rainbow Recording Corp.* 1 Mass. App. Ct. 783, 784, n. 2 (1974). But even assuming the master's report contains sufficient findings for us to infer the necessary flow of water, the report is inadequate in another respect.

The report contains no finding as to the source of the alleged waterflow other than the drainage of surface water from the trustees' land. Contrast *McGowen v. Carr,* 272 Mass. 573, 575-576 (1930); *Kuklinska v. Maplewood Homes, Inc.* 336 Mass. 489, 493 (1957); *Myhr v. Vlahakis,* 348 Mass. 795 (1965). Such a fact, standing alone, does not negative the existence of a natural watercourse. See *Fitzgerald v. Fortier,* 292 Mass. 268, 271, 273-274 (1935). Nor does the fact that the alleged watercourse flowed in a man-made channel along a part of its route. See *Stimson v. Brookline,* 197 Mass. 568, 570-572 (1908); *McGowen v. Carr,* 272 Mass. 573, 575-576 (1930); *Yaskill v. Thibault,* 273 Mass. 266, 267, 268 (1930); *Kuklinska v. Maplewood Homes, Inc.* 336 Mass. 489, 493-494 (1957). But, given these facts, in order for us to find that the now obstructed channel is a natural watercourse, it must also appear that the channel was something more than an artificial "ditch for carrying off surface water and draining the land through which it passed." *Stimson v. Brookline,* 197 Mass. 568, 572 (1908). See *Dickinson v. Worcester,* 7 Allen 19, 21-22 (1863); *Fortier v. H. P. Hood & Sons, Inc.* 307 Mass. 292, 294-296 (1940); *Kuklinska v. Maplewood Homes, Inc.* 336 Mass. 489, 493-494 (1957), citing *Stimson v. Brookline, supra.* Compare *Kuklinska v. Maplewood Homes, Inc., supra,* at 492-493. Here this requirement could best be met by a showing that, at some point in time, surface water from the area in question, unassisted by man, gathered and flowed in a natural channel over substantially the same ground as the now obstructed channel. Compare *Fitzgerald v. Fortier,* 292 Mass. 268, 272-274 (1935), with *Fortier v.*

*H. P. Hood & Sons, Inc.* 307 Mass. 292, 294-296 (1940). See also *Braun* v. *Foxboro Co.* 346 Mass. 771 (1963). But on this issue of fact the master's report is completely silent. It contains no finding (nor any findings which would support an inference, *National Hearing Aid Centers, Inc.* v. *Avers*, 2 Mass. App. Ct. 285, 286 [1974], and cases cited) whether the trustees' "drainage system" is a naturally existing channel, a substitute therefor, or an artificial drainage ditch; it contains no finding whether any "existing flow of water" which the original culvert was designed to carry under the spur track was an existing flow in a natural channel. Although we might infer that the "swampy area" on the defendants' property existed naturally, a swampy area hardly qualifies as the "stream of water . . . having a bed and sides or banks" necessary to constitute a natural watercourse.[4] *Luther* v. *Winnisimmet Co.* 9 Cush. 171, 174 (1851).

2. The master's findings of fact suggest the possibility that the trustees have obtained a prescriptive easement to drain onto the defendants' property. See *Dickinson* v. *Worcester*, 7 Allen 19, 21-22 (1863); *DiNardo* v. *Dovidio*, 312 Mass. 398, 402-403 (1942); *Kuklinska* v. *Maplewood Homes, Inc.* 336 Mass. 489, 494 (1957). But as neither the parties nor the master has considered the question, we are not in a position to make a determination whether the trustees have obtained any such easement. For example, while unexplained use of an easement for twenty years will be presumed to be under claim of right and adverse (*Fortier* v. *H. P. Hood & Sons, Inc.* 307 Mass. 292, 298 [1940]), here, because the easement issue has not been raised, the defendants have had no opportunity to show that the trustees' and their predecessors' use of any easement, even assuming it to have been open and continuous (see *Foot* v.

---

[4] The mere fact that this "swampy area" has no "channel and banks" would not prevent its being part of a larger natural watercourse so long as a significant portion of that natural watercourse did have "a channel and banks." *Yaskill* v. *Thibault,* 273 Mass. 266, 268-269 (1930). *Fitzgerald* v. *Fortier,* 292 Mass. 268, 273-274 (1935).

*Bauman,* 333 Mass. 214, 216-218 [1955]), was permissive, or was abandoned.

3. For the reasons stated above, the master has failed to make sufficient subsidiary findings on vital issues. The case is to be remanded to be further heard by the judge or recommitted to the master to make additional findings. The judge is to determine to what extent the report of the master is to be set aside. *Carson* v. *Brady,* 329 Mass. 36, 42-43 (1952). *Lenari* v. *Kingston,* 342 Mass. 705, 709-710 (1961). *Lattuca* v. *Cusolito,* 343 Mass. 747, 753 (1962). *Mackey* v. *Rootes Motors, Inc.* 348 Mass. 464, 469 (1965).

The interlocutory and final decrees are reversed, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*